UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 2/16/2017

EON SHEPHERD,

          Plaintiff,

        v.

COMMISSIONER BRIAN FISHER, *et al.*,[1]

          Defendants.

No. 08-CV-9297 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

In this action brought pursuant to 42 U.S.C. § 1983, Plaintiff Eon Shepherd, who is currently incarcerated, alleges a variety of federal constitutional claims, all of which arise from events that allegedly occurred between October 2005 and August 2008, while he was an inmate at New York State's Green Haven Correctional Facility ("Green Haven"). Defendants are more than two dozen current and former employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), on behalf of whom the Attorney General of the State of New York has filed the consolidated motion for summary judgment. For the reasons that follow, Defendants' motion is denied in part and granted in part.

## PROCEDURAL HISTORY

Plaintiff filed his Amended Complaint on September 13, 2011. (Am. Compl. (Dkt. 61).) In it Plaintiff brings sixteen separate causes of action against more than thirty Defendants. (Am. Compl. 14–16.) Each cause of action encompasses several individual incidents, spread across a period of more than three years. Shepherd alleges that Green Haven medical staff failed to properly treat his chronic back condition, did not let him out of his cell to receive his prescription

---

[1] The Clerk of the Court is respectfully requested to amend the spelling of Defendants' names in the caption to conform to the spelling used in this Opinion.

medication on at least three occasions, refused to provide proper work boots, ignored his complaints that his painkillers were no longer working, violated his right to medical confidentiality, hindered the delivery of adequate mental health treatment through intimidation, and failed to comply with existing consent orders regarding the delivery of medical and mental health care at Green Haven. He also alleges that improper searches by Green Haven Correction Officers ("C.O.s") on five occasions amounted to sexual abuse and, in several instances, were retaliatory. Additionally, Shepherd claims that his hair—which, as a Rastafarian, he considers sacred—was improperly searched in violation of his First Amendment rights on five separate occasions spanning more than a year, with one such search resulting in the discovery of several ounces of methamphetamine secreted in his dreadlocks. Shepherd further complains that he was denied religious meals on two Rastafarian holidays. He also argues that his sentence of nine months in the Special Housing Unit ("SHU"), imposed for his possession of the methamphetamine, violated his due process rights as a consequence of the hearing officer's alleged failure to adhere to a host of evidentiary rules and other procedural safeguards. Lastly, Shepherd alleges that on at least one occasion, a C.O. improperly confiscated his legal mail. For these alleged abuses, Plaintiff seeks $100,000 in punitive damages and $200,000 in compensatory damages from each Defendant. (*Id.* at 17.)

Due to the need to identify a number of "Doe" Defendants and other service issues, Defendants answered Plaintiff's Amended Complaint in a piecemeal fashion, with all Defendants answering by June 28, 2013. (Dkt. 85.) On April 2, 2014, Defendants filed their consolidated motion for summary judgment, arguing that the majority of Plaintiff's claims are precluded as a matter of law, and that he failed to properly exhaust the remainder, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* (Dkt. 109.) On March 31, 2015, the

2

Court granted in part and denied in part Defendants' motion for summary judgment, and the case was referred to Magistrate Judge Ellis for settlement, which was unsuccessful despite the parties' efforts. (Dkts. 127, 128.) On October 9, 2015, pro bono counsel appeared on behalf of Plaintiff.[1] The Court subsequently ordered additional briefing on Defendants' motion for summary judgment with respect to Plaintiff's allegations of sexual abuse in light of the Second Circuit's ruling in *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015). (Dkt. 159.)[2]

This Opinion sets forth the Court's reasoning for its summary judgment ruling. The Court has reconsidered its decision to grant summary judgment to Defendants on Shepherd's claims that he was sexually assaulted in violation of the Eighth Amendment and that he was denied religious meals for two Rastafarian holidays in violation of the Free Exercise Clause, and for the reasons stated herein the Court is convinced that summary judgment as to these claims must be denied.

Accordingly, Defendants' motion for summary judgment is denied as to the following five claims: (1) Defendant Bentivegna was deliberately indifferent to Plaintiff's requests for pain medication on or about March 3, 2008, violating the Eighth Amendment; (2) Defendants Tweed, Sarles, and Ferrick sexually assaulted Shepherd between 2006 and 2008, violating the Eighth Amendment; (3) Defendant Sarles frisk searched Shepherd on January 23, 2007 in retaliation for filing grievances, violating the First Amendment; (4) Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman, and Wilson searched Shepherd's hair, which as a Rastafarian he considers sacred, in February 2007 and on March 12, 2007, March 6, 2008, March 15, 2008, and August 15, 2008, violating the First Amendment; and (5) Defendant

---

[1] Prior to October 9, 2015, Plaintiff represented himself *pro se*.

[2] On March 25, 2016, Defendants also filed a motion for sanctions seeking to dismiss Plaintiff's complaint with prejudice (Dkt. 175.), but on June 17, 2016, Defendants withdrew that motion (Dkt. 191).

Ercole denied Shepherd two religious meals during Rastafarian holidays important to Shepherd's religious beliefs on October 7, 2005 and May 5, 2008, violating the First Amendment.

Due to the scope and complexity of Plaintiff's allegations, and because each cause of action encompasses a distinct set of incidents, the Court will address the factual record underlying each cause of action in conjunction with its legal analysis.

## STANDARD OF REVIEW

Summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

In deciding whether to grant summary judgment, "courts must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quotation marks omitted). Within that framework, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and the failure to meet that burden warrants denial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets its burden, it falls to the adverse party to demonstrate that there are genuine issues of material fact that remain for trial. *See Anderson*, 477 U.S. at 250.

4

## DISCUSSION[3]

### I.    Plaintiff's Medical Claims

Plaintiff brings seven causes of action related to inadequate medical or mental health care (Am. Compl. 14–16), the majority of which can be construed as raising "deliberate indifference" claims under the Eighth Amendment. Defendants are granted summary judgment on all of these claims with the exception of Plaintiff's deliberate indifference claim against Defendant Bentivegna regarding his requests for pain medication on or about March 3, 2008.

#### A.  The Factual Record

##### *1.  Treatment of Plaintiff's Chronic Back Pain*

Many of Plaintiff's claims relate to the alleged ineffective treatment of his chronic lower back pain. In October 2004, while incarcerated at Wende Correctional Facility ("Wende"), Plaintiff was diagnosed with an L5/S1 stenosis, or narrowing, in his lower back, likely the result of a herniated or degenerative disc. DOCCS medical staff at Wende recommended surgical intervention to decompress and fuse his lumbar spine.

Defendants assert that this procedure was scheduled multiple times, with Plaintiff refusing to undergo surgery each time. (Defs.' R. 56.1 Statement ¶¶ 4–5; Schulze Decl. Ex. C ¶ 4, Ex. A MED 324–326.) Plaintiff, however, asserts that this surgery was scheduled only once, and that he decided not to have the surgery—despite initially consenting—after "consulting with [his] family" and speaking to his orthopedic surgeon, who informed him that there was only a fifty percent chance the surgery would succeed. (Pl.'s Aff. ¶¶ 8–9.)

---

[3] Unless otherwise noted, all facts are drawn from the undisputed portions of Defendants' Local Rule 56.1 Statement. Because Plaintiff verified his Amended Complaint, it "is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Additionally, when the Court describes concessions made by Defendants, it refers to factual allegations that Defendants concede solely for the purposes of this motion, unless otherwise noted. (*See* Defs.' Local R. 56.1 Statement.)

While at Wende, Plaintiff's back pain was treated with a variety of over-the-counter and prescription muscle relaxants and pain killers. (Defs.' R. 56.1 Statement ¶ 7; Pl.'s Aff. ¶¶ 5–6.) Among those drugs prescribed to Plaintiff was Ultram, a non-narcotic pain reliever (Pl.'s Aff. ¶ 5–6; Schulze Decl. Ex. A MED 325), which Plaintiff asserts offered him "no relief." (Pl.'s Aff. ¶ 6.)  Defendants have not addressed Plaintiff's experience with Ultram at Wende.  Eventually, Plaintiff's prescription was changed to Percocet, which appears to have provided Plaintiff relief.

In June 2005, Plaintiff was transferred to Green Haven, where Dr. Bhapale was assigned as Plaintiff's primary medical care provider.  (Pl.'s Aff. ¶ 11 (acknowledging that Dr. Bhapale was his "health care provider," but clarifying that Dr. Bernstein, the "facility health service director," made all final decisions as to his healthcare).  Dr. Bhapale prescribed Shepherd a variety of medications, including Percocet, to manage his lower back pain.

On October 16, 2005, Plaintiff was unable to pick up his pain medication, as C.O. White did not let Plaintiff out of his cell until after the medical office had closed for the day.  The next day, however, Plaintiff saw Dr. Bhapale, who renewed his prescriptions for Percocet and other medications.  Plaintiff otherwise alleges that he was prescribed Percocet without incident until November 2006.  (Am. Compl. ¶ 10.)

Shepherd alleges that he received "ineffective, meaningless care for [his] chronic excruciating lower back pain" from November 26, 2006 until late March 2007.  (Am. Compl. ¶ 11.)  As a result of this allegedly ineffective care, Plaintiff asserts he "was in extreme pain and discomfort, unable to dress and undress, use the toilet, sneeze, and ambulate without extreme pain and discomfort and [he] was unable to sleep."  (Pl.'s Aff. ¶ 60.)

The record suggests that this period of allegedly ineffective care began on November 9, 2006, after a consultation with Dr. Bhapale—several weeks earlier than Plaintiff alleges in his

6

Amended Complaint. (Schulze Decl., Ex. A at MED 782, Ex C. ¶ 8; Pl.'s Opp. Ex. Bern. #1.)

Following this consultation, Plaintiff's prescription for Percocet was discontinued, and Plaintiff

only received non-narcotic pain medication for his back pain until February 13, 2007, when he

was prescribed OxyContin. (Schulze Decl., Ex C. ¶¶ 12-13.)

Exactly what occurred during the Plaintiff's November 9, 2006 consultation with Dr.

Bhapale is disputed. Plaintiff asserts that Dr. Bhapale "took [him] off [his] pain medication and

issued a no work permit," despite Plaintiff "never ask[ing] the doctor to discontinue [his] pain

medication." (Pl.'s Aff. ¶ 13.) But in a letter to Dr. Bernstein dated November 9, 2006, Plaintiff

acknowledges that the "no working permit" was previously issued and the consultation with Dr.

Bhapale was scheduled because Plaintiff sought to have the earlier "no working permit" rescinded

so that he could return to his job as a porter. (Pl.'s Opp. Ex. Bern. #1.) In the same letter, Plaintiff

also acknowledges that Dr. Bhapale informed him he could return to work only if he ceased taking

Percocet, a narcotic, and that Dr. Bernstein had ordered Dr. Bhapale to begin transitioning Plaintiff

off of Percocet. (*Id.*) This account is largely consistent with Dr. Bhapale's consultation notes

from November 9, 2006, which suggest that Plaintiff requested to "cancel 'no work'" and was told

that he could not return to work unless he went off Percocet. (*See* Schulze Decl. Ex. A at MED

782.) A factual dispute nevertheless remains as to whether Plaintiff requested to be taken off

Percocet, or whether this change in treatment was ordered, over Plaintiff's objection, by Drs.

Bhapale and Bernstein.

The nature of the treatment Plaintiff received immediately following his November 9, 2006

consultation is unclear. Several of Plaintiff's exhibits—his letters to various members of the Green

Haven medical staff—indicate that he was without any pain medication for some period of time

(*see* Pl.'s Opp. Exs. Bern. #2, Bern. #4, Bern. #5). But a later letter to Dr. Koenlgamann suggests

that Plaintiff's Percocet prescription was reduced, not discontinued entirely, after the November 9, 2006 consultation; that Plaintiff continued to receive this reduced—and, he asserts, ineffective—dosage through November 26, 2006; that he received no medication for his "pain[,] period" for a short duration, but was, at some point, prescribed an emergency four-day dose of Percocet to last until his next consultation with Dr. Bhapale; and that, at this consultation on December 6, 2006, Dr. Bhapale prescribed a course of Ultram. (Pl.'s Opp. Ex. Keog. #1.) Plaintiff's medical records, offered by Defendants, indicate that his Percocet prescription was not fully discontinued until December 5, 2006. (Schulze Decl. Ex. A at MED 774–76.) Defendants, meanwhile, assert that Plaintiff was temporarily housed at another facility after his November 9, 2006 consultation, but that he was prescribed Ultram as soon as he returned to Green Haven. (Schulze Decl. Ex. C ¶ 8.)

Regardless, by early December, Plaintiff had been prescribed Ultram and began to complain that it did not adequately address his back pain. On December 7, 2006, for instance, Plaintiff wrote Drs. Bernstein and Koenlgamann to complain about its ineffectiveness. (Pl.'s Opp. Exs. Bern. #6, Keog. #1.) Plaintiff also wrote similar letters of complaint to Dr. Lester Wright, Associate Commissioner of Health Services at DOCCS, and DOCCS Commissioner Goord. (Pl.'s Opp. Exs. Wrght #1, Goord #1), in addition to filing a formal grievance (*id.* Ex. Griev. #1). Plaintiff's medical records, offered by Defendants, suggest that his doctors were responsive to these complaints. (Schulze Decl. Ex. A at MED 774–76.) They show that, after being prescribed Ultram on December 5, 2006, Plaintiff was then prescribed Toradol two days later and again on December 11, 2006; was prescribed a short dose of Percocet on December 13, 2006; and was prescribed MS Contin on December 15, 2006. (*Id.*)

Indeed, Plaintiff concedes that from mid-December 2006 until mid-February 2007, he received short courses of various alternative pain medications in response to his complaints about

8

Ultram. Plaintiff, however, asserts his medical records clearly indicate that Ultram—the initial medication on which Plaintiff was placed after his prescription for Percocet was discontinued— had not sufficiently mitigated the severity of his back pain when prescribed to him in the past, a fact of which, he asserts, Defendants should have been aware. (Pl.'s Aff. ¶ 15; Pl.'s Opp. Exs. Bern. #6, Keog. #1.)

During this mid-December to mid-February period, Plaintiff was also referred to an outside specialist in pain management. According to Defendants, this specialist determined that Plaintiff was exaggerating his symptoms and recommended that he be treated with non-narcotics and given narcotics only if necessary and in the lowest dosage possible. (Schulze Decl. Ex. A at MED 771, Ex. C ¶ 11.) Plaintiff, however, asserts that the specialist was unable to successfully examine him, as the examination itself caused excruciating pain, but acknowledges that the specialist found nothing wrong with his back. (Pl.'s Aff. ¶ 17.) During this period, Dr. Bernstein also scheduled Plaintiff for an MRI and again recommended surgical intervention, which Plaintiff declined. (Pl.'s Aff. ¶ 18.)

On February 13, 2007, Plaintiff was prescribed OxyContin to manage his back pain, which offered him relief, at least initially. (Pl.'s Aff. ¶ 17.) Defendants assert that, after February 2007, Plaintiff did not complain of serious back pain or request a change in medication. (Schulze Decl. Ex. C ¶¶ 13-14.) Plaintiff disputes this account. Specifically, he asserts that, beginning on March 3, 2008, he complained to Defendant Bentivegna, his medical provider in the SHU, that his pain medication "was not offering [him] any relief as it did prior." (Pl.'s Aff. ¶ 24; *see* Am. Compl. ¶ 16.) Plaintiff purportedly explained to Dr. Bentivegna that "Dr. Bohaple had explained to [him] that after being on a medication, taking the same dosage for a long period of time, that the medication will no longer offer [him] relief and the dosage has to be raised in order for the pain

9

medication to offer relief and be effective. [He] informed Dr. Bentivegna that the medication [he] was taking was a low dosage and had been taking the said dosage for close to a year and [he] was not receiving relief for [his] pain." (Am. Compl. ¶ 16; *see* Pl.'s Aff. ¶ 24; *see also* Pl.'s Opp. Ex. Bern. #7.) Dr. Bentivegna allegedly "ignored [him] and did nothing to offer [him] effective treatment." (Pl.'s Aff. ¶ 24.) An affidavit from fellow inmate, Derrick Bonner, on March 31, 2008, corroborates Plaintiff's assertion that his back was "killing him" during this time and that Shepherd communicated that to Dr. Bentivegna. (Pl.'s Opp. Ex. Aff. of Bonner.)

During this time, Dr. Bentivegna also spoke to Plaintiff at his cell door about his pain medication, such that officers and other inmates could overhear their conversation. Plaintiff asserts that Dr. Bentivegna carried on these conversation despite a request by Plaintiff that they discuss his medical issues in private. (Pl.'s Aff. ¶ 25.) Defendants concede that Plaintiff's conversations with Dr. Bentivegna were audible to other officers and inmates, but have not otherwise responded to Plaintiff's allegations regarding Dr. Bentivegna's conduct. (Defs.' R. 56.1 Statement ¶ 78.)

Around this same time, on February 26 and February 27, 2008, Plaintiff was allegedly prevented from getting his evening doses of pain medication by C.O. Smith, which he asserts caused him "excruciating pain." (Pl.'s Aff. ¶¶ 22, 23.) Plaintiff's medical records indicate that he was seen by medical staff on February 28 and February 29, 2008, and that they did not find Plaintiff to be in acute distress, but nonetheless renewed his OxyContin prescription. (Schulze Decl. Ex. A at MED 104.)

### 2. *Medical Boots*

Plaintiff also claims that he was provided improper medical boots by Defendants. Plaintiff's medical records indicate that on May 10, 2000, he was first prescribed a "Lightweight Boot" by Dr. Albert Paolano at Great Meadow Correction Facility, where Plaintiff was

incarcerated at the time. (Pl's. Opp. Ex. A.) Dr. Paolano's report indicates that he prescribed a lightweight boot to "minimize strain" on Plaintiff's right knee, and to "help /w hammer Toes also." (*Id.*) The medical significance of lightweight boots is disputed; Defendants contend that "the weight of the boot is of no medical significance whatsoever." (Schulze Decl. Ex. C ¶ 17.)

At Green Haven, Plaintiff alleges that he was without "special issue boots from December 2006, [u]ntil August 2007." (Am. Compl. ¶ 13.)[4] Plaintiff's account of this issue is inconsistent, disputed by Defendants, and contrary to the record.

Defendants assert that Plaintiff requested new boots in December 2006, which he was prescribed "[s]hortly thereafter." (Schulze Decl. Ex. C. ¶ 15.) The record indicates that Plaintiff received special issue boots on May 15, 2007 (Schulze Decl. Ex. A at MED 842), but that he complained to Defendants Bernstein, Bhapale, Fisher, and Koenlgamann on May 24, 2007 that, although these special issue boots "fit," they were too heavy. (Schulze Decl. Ex. A at MED 842; *see also* Pl.'s Aff. ¶¶ 19, 20). On September 21, 2007, after his request for new boots was denied by Drs. Koenlgamann and Bernstein, Plaintiff visited Dr. Bhapale, who, after speaking with Dr. Bernstein, told Plaintiff that his request had been reviewed and that new boots were "not medically indicated." (Schulze Decl. Ex. A at MED 836; *see also* Pl.'s Aff. ¶ 20).[5]

---

[4] In his opposition papers, Plaintiff also alleges, for the first time, that his "medical boots [were] taken from him on or about 2/28/08, [and] he was not issued 'light weight' medical boots until June 2010," (Pl.'s Opp. 22). This allegation is not properly before the Court as it is both new and inconsistent with the original timeframe set out in Plaintiff's Amended Complaint. *Cf. Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering factual allegations raised by pro se plaintiff in his opposition papers that were "consistent" with those in the initial and amended complaints).

[5] Plaintiff's medical records contain notes from Dr. Bhapale's September 21, 2007 consultation with Plaintiff that refer to a July 2, 2007 consultation, and indicate that it was on the basis of this earlier consultation that lightweight boots were determined not to be "medically indicated." (Schulze Decl. Ex. A at MED 836.) It is unclear with whom Plaintiff met on July 2, 2007 and Defendants have failed to provide any information about that consultation. (*Id.*)

11

Plaintiff, meanwhile, acknowledges both that "he requested lightweight medical boots . . . because the boots that [he] had were worn down," and that he was eventually issued boots by Dr. Bhapale in response to this request. (Pl.'s Aff. ¶ 19.) Plaintiff does not specify, however, when he was issued such boots. Nor does he provide any basis—beyond his affidavit—for his claim that he was without boots until August 2007. It is similarly unclear what occurred in August 2007 to resolve Plaintiff's concerns regarding his medical boots, as it does not appear he was ever issued the "lightweight" boots he sought.

### 3. *Access to Mental Health Treatment*

Plaintiff also asserts that due to threats and harassment by DOCCS officers on three separate occasions, he was denied mental health treatment. (*See* Pl.'s Aff. ¶¶ 26–30.)

According to his medical records, Plaintiff suffers from post-traumatic stress disorder ("PTSD") (Pl.'s Opp. Exs. D1–D3), for which he has seen a therapist and been prescribed medication (Pl.'s Aff. ¶ 26). On three separate occasions, January 18, 2006, January 10, 2007, and January 23, 2007, Plaintiff visited the mental health unit at Green Haven to see his therapist. (Pl.'s Aff. ¶¶ 26–30.) On at least one occasion, however, Plaintiff asked to be returned to his cell. (Pl.'s Aff. ¶ 29.)

Defendants assert that Plaintiff asked to be returned to his cell because he did not want to speak to his therapist, but acknowledge—for the purposes of summary judgment—that C.O.s Sarles, Eagon, and Morris were present in the mental health unit on these occasions and spoke "rudely" to Plaintiff. (Defs.' R. 56.1 Statement ¶ 35.) Plaintiff asserts that he refused to see his therapist after these C.O.s verbally and physically threatened him. (*See* Pl.'s Aff. ¶¶ 26–30.)

On or about January 18, 2006, Plaintiff asserts that he went to see his therapist, Morales, in the mental health unit at Green Haven. (*Id.* ¶ 26; Pl.'s Opp. Exs. Morales #1, Morales #2.)

While there, he asserts that "prison guards Sarles and [Eagon] approached [him] and began using profane, abusive language towards [him] threatening [him] asking why [he did] not want to speak to the therapist." (Pl.'s Aff. ¶ 27.) Shepherd further asserts that he did speak to his therapist, but that as he was speaking, "Sarles was at the door listening and when [Plaintiff] came out, he began mocking [him]." (*Id.* ¶ 28.)[6]

In two letters dated January 18, 2006, Plaintiff complained about this incident to Commissioner Goord and his therapist. (Pl.'s Opp. Exs. Goord #2, Morales #1.) Plaintiff's letter to Morales suggests that Plaintiff and Morales did speak on the date of the incident, but that Plaintiff prematurely ended the session after noticing he was being watched by C.O. Sarles. (Pl.'s Opp. Ex. Morales #1.) In the same letter, Plaintiff elaborates on the nature of the threats he allegedly received from Defendant Sarles, although the precise timing of these threats is unclear: "officer Sarl[e]s started to curse at [Plaintiff] stating that [Plaintiff] think[s] [he is] running shit up there [in the mental health unit] and [Plaintiff] always caus[es] a fucking problem and that he would fuck [Plaintiff] up and have [him] set up and placed in the box because he use[d] to run the box up stairs and he has a lot of friends in this prison and he would get [Plaintiff] hurt." (*Id.*) As a consequence of these threats, Plaintiff alleges that he was "in fear for [his] well being," and asked Morales, "Please leave me alone, do not call me up there for anything, I do not want anything to do with those officer[s] up there and I do not feel safe coming up there after being threatened by the officer because his fellow officers can do as he threatened to be done." (*Id.*) Plaintiff's letter

---

[6] Defendants' Local Rule 56.1 Statement and Plaintiff's Affidavit identifies the date of this incident as February 18, 2006, but Plaintiff's letters concerning these same facts are dated January 18, 2006, and state that the incident occurred "today" (Pl.'s Opp. Ex. Morales #1) and on "January 18, 2006" (Pl.'s Opp. Exs. Goord #2). Accordingly, the Court assumes that the event occurred on January 18, 2006.

to Commissioner Goord addresses a largely identical set of concerns but add that Officer Sarles "said that he will cut my dread lock off and shove it up my ass." (Pl.'s Opp. Ex. Goord #2.)

On January 10, 2007, Plaintiff was again called to the mental health unit. Plaintiff asserts he was "in fear for [his] life and safety, and requested to return to [his] housing unit," and that C.O. Morris "began threatening [him], using profane, degrading language." (Pl.'s Aff. ¶ 29.)

On January 23, 2007, Plaintiff was called back to the mental health unit a third time. Plaintiff asserts that on this visit, "C.O. Sarles conducted a pat frisk in a rough sexual manner using a hand scanner pushing it between [Plaintiff's] buttocks cheeks roughly saying he was going to fuck [Plaintiff] in [his] ass with said scanner because [Plaintiff] wrote him up." (*Id.* ¶ 30; Schulze Decl. Ex. B 100:12–102:19.) In his Amended Complaint, Plaintiff further alleges that he initially refused to see his therapist on January 23, 2007, but that C.O. Sarles "ordered [him] to shut the fuck up and sit down, which [he] did due to fear for [his] safety." (Am. Compl. ¶ 20.) Plaintiff also alleges that "while [Plaintiff was] speaking to the doctor, [C.O. Sarles] was at the door listening to [Plaintiff's] conversation and when [Plaintiff] left the offices, Sarles began mocking [Plaintiff] repeating things that [Plaintiff] had revealed to the doctor." (*Id.*)

Plaintiff asserts that he reported this third incident to C.O. Sarles' "supervisors and the superintendent" and that he "filed grievances that was labeled physical assault which was appealed to Albany." (Pl.'s Aff. ¶ 30.) Plaintiff's exhibits, however, include only a letter to Morales about the incident and a January 16, 2008 opinion by the Central Office Review Committee ("CORC"), the highest level of appeal for the State's Inmate Grievance Program ("IGRP"), which discusses in general terms mental health concerns raised by Plaintiff, but does not provide detail sufficient to determine whether it represents the final disposition of Plaintiff's grievance of the January 23, 2007 incident. (Pl.'s Opp. Exs. Morales #2, Griev. #4.) For the purposes of their motion,

Defendants accept Plaintiff's characterization of C.O. Sarles' conduct (Defs.' Mem. 6), but contend that Plaintiff did not properly appeal his grievance related to this incident (*id.*; Hale Decl. ¶¶ 11–13.)

A January 30, 2007 letter to Plaintiff from Viktoria Fisher, a risk management specialist at the Central New York Psychiatric Center, a state facility, suggests that Plaintiff reported suffering anxiety and difficulty sleeping as a consequence of his denied mental health treatment. (Pl.'s Opp. Ex. E.) Plaintiff does not assert that he otherwise suffered any psychological trauma.

### B. Legal Analysis

The Eighth Amendment's prohibition on the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, applicable to the states by the Fourteenth Amendment, *Estelle v. Gamble*, 429 U.S. 97, 101 (1976), "applies to prison officials when they provide medical care to inmates," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). The mere "inadvertent failure to provide adequate medical care cannot be said to" violate the Eighth Amendment, however. *Estelle*, 429 U.S. at 105. Instead, prison officials must act with "deliberate indifference to serious medical needs." *Id.* at 106.

The "deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway,* 37 F.3d at 66. A prisoner must demonstrate both that "the alleged deprivation [was] sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exist[ed]," and that the official acted with a "sufficiently culpable state of mind." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted).

The objective prong is highly "contextual and fact-specific," *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quotation marks omitted), and itself entails two separate inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin*

15

*v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  This inquiry turns on the reasonableness of the provided care.  "[P]rison officials who act reasonably cannot be found liable," while those who "fail[] to take reasonable measures" can be found liable under the Eighth Amendment.  *Farmer v. Brennan*, 511 U.S. 825, 845, 847 (1994).  Where a prison official has acted unreasonably, the second inquiry is "whether the inadequacy in medical care is sufficiently serious."  *Salahuddin*, 467 F.3d at 280.  That inquiry turns on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract."  *Smith,* 316 F.3d at 186.

To satisfy the subjective prong of deliberate indifference, a prisoner must show that prison officials acted—or failed to act—while "actually aware of a substantial risk that serious inmate harm [would] result."  *Salahuddin*, 467 F.3d at 280.  Thus, a prisoner must prove at least that officials acted recklessly:  an "official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices."  *Id.*; *see also Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).  Importantly, however, neither "mere disagreement over the proper treatment" nor "negligence, even if it constitutes medical malpractice," rise to the level of constitutional violation.  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  *See also Hill*, 657 F.3d at 123 ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.").

Pursuant to this framework, the Court analyzes each of Plaintiff's "deliberate indifference" causes of action, in turn.

### *1. Deliberate Indifference to Serious Medical Needs*

In his first cause of action, Plaintiff alleges that Defendants Koenlgamann, Bhapale, Bernstein, and Bentivegna (collectively, the "Medical Defendants") showed deliberate indifference to his serious medical needs by failing to provide "effective pain medication that offered relief as well [as] failing to prescribe light weight boots." (Am. Compl. 14.) In his second cause of action, Plaintiff similarly alleges that Defendants Bhapale and Bernstein "knowingly and intentionally discontinued effective pain medication for several months, failing to provide [Plaintiff] with effective adequate, meaningful care." (*Id.*)

Although Plaintiff considered his special issue boots inadequate and alleges that they caused him "discomfort and pain when walking," (Am. Compl. ¶ 13), this is not a case in which "he was denied care that a doctor prescribed as appropriate," *Giambalvo v. Sommer*, No. 10-CV-6774, 2012 WL 4471532, at *5 (S.D.N.Y. Sept. 19, 2012). Defendants have demonstrated that Plaintiff was provided a pair of boots fitted to his individual knee and toe conditions, and was denied a request for lighter boots not out of caprice, but on the basis that they were not "medically indicated." (Schulze Decl., Ex. A at MED 836.) Plaintiff's claim that the Medical Defendants failed to prescribe lightweight boots cannot, therefore, survive the objective "reasonableness" prong of the deliberate indifference standard. Even if it could, Plaintiff can at best show that the Medical Defendants were negligent.[7] Because Plaintiff's claim that the Medical Defendants failed to prescribe lightweight boots amounts only to "mere disagreement over [what constitutes] proper treatment," *Chance*, 143 F.3d at 703, Defendants' motion for summary judgment on this issue is granted.

---

[7] Plaintiff's medical boots claims fail as to Defendant Bentivegna for a more basic reason: Plaintiff has failed to allege any facts demonstrating Defendant Bentivegna's personal involvement in this issue.

Plaintiff's claim that he was without "special issue boots from December 2006, [u]ntil August 2007," (Am. Compl. ¶ 13), is also precluded as a matter of law. First, Defendants have demonstrated that Plaintiff received new, special issue boots at least by May 15, 2007. (Schulze Decl., Ex. A at MED 842.) Plaintiff's claim that he lacked boots until August of 2007 is thus erroneous. Second, even if Plaintiff did lack special issue boots from December 2006 to August 2007, and even assuming that his purported discomfort during this period was sufficiently severe,[8] he has not alleged that he lacked proper boots as a consequence of Defendants' deliberate indifference. He does not claim, for instance, that he requested new boots and that this request was denied—facts that might tend to show Defendants acted unreasonably, or with constitutionally cognizable culpability. Indeed, he acknowledges that Defendants did, upon request, provide him new boots, and contends only that these boots were unsatisfactory because they were not sufficiently lightweight. (Pl.'s Aff. ¶ 19.) Defendants' motion for summary judgment is granted as to this issue. Plaintiffs' medical boots claims cannot go forward.

Plaintiff's claim that Defendants failed to prescribe effective pain medication for his chronic lower back pain is also precluded as a matter of law. The record demonstrates that Plaintiff's ongoing need for pain medication arose, at least in part, from his own choice to forego the surgical intervention recommended by his treating physicians.[9] Defendants, moreover, did not cease treatment of Plaintiff's chronic lower back pain in response to his refusal to undergo surgery.

---

[8] *But cf. Hernandez v. Goord*, 02-CV-1704, 2006 WL 2109432 at *1, 5–6 (S.D.N.Y. July 28, 2006) (finding plaintiff's painful injured foot, diagnosed as hammertoe with an overlap, insufficiently severe to state a viable deliberate indifference claim).

[9] In a February 20, 2007 letter to Defendant Koenlgamann, Plaintiff asserts he was told that there was "a 50, 50 chance that the operation will not help, and even if it did help, [he would] still have back pain." (Pl.'s Opp. Ex. Keog #2; *see also* Pl.'s Aff. ¶ 9.) Defendants have not presented conflicting evidence, so the Court assumes that the surgery, if effective, would not have entirely eliminated Plaintiff's back pain or the need for some degree of continuing pain management.

Plaintiff acknowledges that he received effective pain medication (Percocet) until at least mid-November 2006 (Am. Compl. ¶¶ 10, 11; *see also* Pl.'s Opp. Exs. Wrght #1; Schulze Decl., Ex. C at ¶ 5.), although there was at least one instance in which he was let out of his cell too late to pick up this pain medication. Plaintiff alleges that he received "ineffective meaningless care for [his] chronic excruciating lower back pain" from November 26, 2006 until late March 2007. (Am. Compl. ¶ 11.) Construing the facts in Plaintiff's favor, on November 9, 2006, Plaintiff saw Defendant Bhapale, his primary medical care provider at Green Haven (Schulze Decl. Ex. A at MED 782, Ex C. ¶ 8; Pl.'s Opp. Ex. Bern. #1); following that consultation Plaintiff's prescription for Percocet was discontinued (Pl.'s Aff. ¶ 13; Schulze Decl. Ex. C ¶ 8); and that Plaintiff did not receive relief from his back pain until he was prescribed OxyContin on February 13, 2007. (Schulze Decl. Ex. A at MED 776.) Even if the significant inconsistencies in his own exhibits are resolved in Plaintiff's favor the record suggests that Plaintiff was without medication entirely for less than a month at most—as his medical records indicate that he received a prescription for Ultram on December 5, 2006. (Schulze Decl. Ex. A at MED 776.)

Defendants have not responded to Plaintiff's related contention, supported in the record, that they were, or should have been, aware that Ultram—the initial medication on which Plaintiff was placed after his prescription for Percocet was discontinued on December 5, 2006 —had not sufficiently mitigated the severity of Plaintiff's back pain when it had been prescribed to him at an earlier facility. (*See* Pl.'s Aff. ¶ 15; Pl.'s Opp. Exs. Bern. #6, Keog. #1.) But Plaintiff has not alleged that Defendants were actually aware of Plaintiff's history with Ultram as of November 9, 2006, and the record indicates that Plaintiff was switched from Ultram to Toradol, a painkiller with which Plaintiff alleges no previous experience, on December 7, 2006 (Schulze Decl., Ex. A at MED 776), the same day Plaintiff appears to have first written Defendants Bernstein and

19

Koenlgamann to complain about the ineffectiveness of Ultram (Pl.'s Opp. Exs. Bern. #6, Keog. #1.) Plaintiff even concedes that Defendants prescribed various alternative pain medications immediately after he began complaining that the Ultram he was taking did not adequately control his back pain.

Construed in the light most favorable to Plaintiff, Defendants' conduct thus does not rise to the level of constitutional violation. This is not a case in which Defendants "refused to treat [Plaintiff's] condition, failed to provide prescribed treatment, or placed unreasonable conditions on the receipt of treatment." *Reyes v. Gardener*, 93 F. App'x 283, 285 (2d Cir. 2004) (summary order). Instead, Defendants repeatedly offered surgical intervention, continually readjusted their strategies for managing Plaintiff's chronic pain, and relented in their efforts to manage his pain using non-narcotic painkillers after less than three months. When actually made aware of Ultram's ineffectiveness, Defendants tried—several times—to find a drug that would adequately manage Plaintiff's pain.

Moreover, if Defendants had acted unreasonably when they discontinued Plaintiff's Percocet prescription, Plaintiff has not demonstrated that they did so with deliberate indifference. Plaintiff asserts only that this change in treatment was made over his objections, not that Defendants acted with "a conscious disregard of a substantial risk of serious harm." *Hill*, 657 F.3d at 123.[10] In short, he has not shown that the "prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition, much less . . . that defendants were . . . aware that their prescribed treatment plan was medically inadequate." *Reyes*, 93 F. App'x at

---

[10] For the purposes of deciding Defendants' motion, the Court assumes that Plaintiff's back pain during this period was sufficiently severe for Eighth Amendment purposes. *See Nelson v. Rodas*, No. 01-CV-7887, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) ("Severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment."); *see also Guarneri v. Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008).

285.   Accordingly, Defendants' motion for summary judgment as to this claim is granted.  *See*
*Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (granting summary judgment where
plaintiff's allegation was "essentially a disagreement with his medical providers' decision not to
prescribe stronger pain medication than Tylenol rather than a claim that medical attention was
denied entirely."), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).[11]

Summary judgment is denied, however, as to Plaintiff's allegations that Defendant
Bentivegna, who served as Plaintiff's primary medical care provider while he was confined to
SHU, "did nothing to change [his] medication and prescribe effective medication for [his] extreme
pain," despite Plaintiff informing Defendant that "the medication [he] was taking was a low dosage
and had been taking the said [dosage] for close to a year and [he] was not receiving relief for [his]
pain." (Am. Compl. ¶ 16; *see* Pl.'s Opp. Ex. Bern #7.).  Defendants have not responded to these
allegations.  In his affidavit in opposition to summary judgment, Plaintiff restates these allegations,
asserting that, beginning "on or about 3/3/08," Defendant Bentivegna "ignored [his requests for
pain relief] and did nothing to offer [him] effective treatment."  (Pl.'s Aff. ¶ 24.)

Because Plaintiff has provided an affidavit from a fellow inmate corroborating that his back
was "killing him" while in the SHU (Pl.'s Opp. Ex. Aff. of Bonner), there is at least some evidence
to suggest that the consequences of Bentivegna's purported failure to provide Plaintiff adequate
medical care were sufficiently severe for Eighth Amendment purposes, thus meeting the objective
prong.  Plaintiff, moreover, has asserted that he made Defendant Bentivegna aware of his suffering,
and that Defendant still refused to act—a factual basis from which it is possible to infer that
Bentivegna acted with constitutionally cognizable culpability, thus sufficiently alleging facts to

---

[11] As with Plaintiff's medical boots claims, his claims regarding this period of pain management
fail as to Defendant Bentivegna because Plaintiff has failed to allege any facts demonstrating Defendant
Bentivegna's personal involvement in this issue.

21

meet the subjective prong. Given Defendants' failure to respond to this claim with any evidence to the contrary, summary judgment is denied.

### *2. Interference with Pain Medication*

In his fourth cause of action, Plaintiff alleges that Defendants White and Smith "knowingly and intentionally denied and interfered with [his] medical care, denying [him] prescribed pain medications, leav[ing] [him] in extreme pain [and] suffering." (Am. Compl. 14.) Plaintiff asserts that he was denied his pain medication three times, once by Defendant White, on October 16, 2005, when he was let out of his cell too late to pick up his medication, and twice by Defendant Smith, on February 26, 2008 and February 27, 2008, while confined to his cell for disciplinary reasons. Plaintiff asserts that the first incident left him in "extreme pain," (Pl.'s Aff. ¶ 12), and that the latter two incidents left him in "excruciating pain," (*id.* ¶ 22–23).

This claim fails as a matter of law. No reasonable jury could find that Defendants White and Smith acted with deliberate indifference to Plaintiff's serious medical needs. Plaintiff was promptly seen by Green Haven medical staff within a day or two of the dates he alleges that he was let out of his cell too late to pick up his medication and there is no allegation he suffered lasting damage as a result. (*See* Schulze Decl. Ex. A at MED 104, 310). Therefore, the particular risk of harm faced by Plaintiff as a consequence of Defendants' actions was not sufficiently serious. *See Evans v. Bonner*, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (granting defendants judgment as a matter of law where plaintiff's medications were delivered late and plaintiff alleges that he suffered pain as a result). Nor would Plaintiff be able to show that either Defendant acted with the requisite state of mind, as he has not asserted that they were aware of the risk that Plaintiff would suffer severe pain as a consequence of missing one or two doses of pain medication.

Defendants' motion for summary judgment is granted as to Plaintiff's fourth cause of action.

### 3. *Access to Mental Health Treatment*

In his fifth cause of action, Plaintiff alleges that Defendants Sarles, Eagon, and Morris, "denied [him] mental health treatment and/or access to such treatment." (Am. Compl. 14.) Although Defendants Sarles, Eagon, and Morris are not medical personnel, such claims are nonetheless evaluated under the "deliberate indifference" framework of the Eighth Amendment. Non-medical personnel, like prison guards, manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104–05; *see also Hodge v. Coughlin*, No. 92-CV-0622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994) (explaining that non-medical prison officials violate the Eighth Amendment where they have either "intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or . . . the inmate [has] suffered a complete denial of medical treatment."), *aff'd*, 52 F.3d 310 (2d Cir. 1995).

If an inmate fails to demonstrate that prison officials knew, or should have known of an underlying mental health condition that, left untreated, could result in serious injury or harm, courts have entered judgment in favor of defendants because plaintiff has failed to create a genuine issue of fact as to the subjective requirement of an Eighth Amendment claim. *See Doe v. Selsky*, 973 F. Supp. 2d 300, 303 (W.D.N.Y. 2013) (granting summary judgment in favor of prison officials as to claim that they failed to prevent inmate's suicide attempt where no indication inmate "told them that he was having suicidal thoughts, or that they knew of any other information that he might be at risk for suicide."); *see also Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (reversing district court's denial of prison officials' summary judgment motion

where plaintiff-inmate's "version of the facts raise[d] no genuine issue as to [the] subjective element, because there [was] no evidence that [officials] thought that denying [plaintiff's] request for a leave of absence" for unspecified essential medical care "would cause him serious harm."). Here, Plaintiff has not asserted that Defendants Sarles, Eagon, or Morris had any reason to know of Plaintiff's PTSD diagnosis. Even assuming that Defendants should have inferred that Plaintiff had a mental health condition from his visits to a prison therapist, there is no basis for finding that Defendants were, or should have been aware, of the particular nature or severity of Plaintiff's condition.

If "[D]efendants deliberately interfered with [Plaintiff's] medically prescribed treatment solely *for the purpose* of causing him unnecessary pain, they may be subject to liability despite the likelihood that he suffered no permanent injuries," *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (emphasis added), but Plaintiff has not alleged that Defendants acted with such deliberateness here. Read in the light most favorable to Plaintiff, the record shows only that Defendants deliberately taunted or harassed Plaintiff, not that they did so to exacerbate his underlying psychological condition—or even with an awareness of such a risk. Aside from his presence in the mental health unit, moreover, nowhere has Plaintiff asserted that he was in "extreme [psychological] pain and [that he] made his medical problems known to the attendant prison personnel." *Hodge*, 1994 WL 519902, at *11; *see Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000) ("rudeness and name-calling does not rise to the level of a constitutional violation"). Plaintiff has thus failed to show that Defendants acted with constitutionally cognizable culpability.

Plaintiff also has not shown any injury or demonstrated that he was actually denied reasonable psychological care. Plaintiff, for instance, asserts that on January 18, 2006, he was able to speak to his therapist. (Pl.'s Aff. ¶ 28.) Similarly, as to the January 23, 2007 incident, it appears

that Plaintiff was able to visit with his therapist, despite Defendant Sarles conducting a pat frisk. (Am. Comp. ¶ 20.) Only as to the January 10, 2007 incident does Plaintiff assert that he did not see his therapist and asked to return to his cell because of threatening language from the guards. (*Id.* ¶ 29.)

Even as to this isolated incident, however, Plaintiff has not alleged that his PTSD symptoms intensified or worsened, or any other related harm, as a consequence of not speaking with his therapist. *See R.T. v. Gross*, 298 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) ("Because Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis, he cannot be said to be have had a serious medical need."). Thus, although Plaintiff asserts that Defendants' conduct placed him in "fear of going to the mental health unit for treatment," (Pl.'s Aff. ¶ 28), he cannot, as a matter of law, make out the objective or subjective prongs of a "deliberate indifference" claim on the record before the Court.[12] Defendants' motion for summary judgment is granted as to the claims encompassed by Plaintiff's fifth cause of action.

### 4. *Training and Supervision*

Plaintiff's tenth, twelfth, and thirteenth causes of action consist, in part, of claims that senior DOCCS officials, including Green Haven Superintendent Ercole, DOCCS Commissioner Fisher, and Green Haven Deputy Superintendent of Security Koskowski (collectively, the "Supervisory Defendants") failed to properly train and supervise their subordinates as to the delivery of Plaintiff's medical and mental health care. (*See* Am. Compl. 15–16.)

---

[12] A letter addressed to Plaintiff from a New York State mental health official suggests that Plaintiff may have suffered from anxiety and trouble sleeping as a consequence of not seeing his therapist (Pl.'s Opp. Ex. E), but nowhere else is this implication directly alleged, asserted, or even addressed.

In his tenth cause of action, Plaintiff alleges in part that the Supervisory Defendants failed to "ensure their subordinates were adequately and properly trained in dealing with mental health prisoners." (*Id.* at 15.) Similarly, in his twelfth cause of action, Plaintiff alleges in part that Defendants Ercole and Fisher "failed to ensure that [he] received effective, adequate meaningful medical treatment, [and also] fail[ed] to ensure that employees in the medical department were adhering to DOC[C]S health policies, directives, and patient bill of rights." (*Id.* at 16.) And in his thirteenth cause of action, Plaintiff alleges in part that Defendants Fisher and Ercole "failed to ensure, medical staff were adequately trained and properly supervised." (*Id.*)

"It is well-settled that a supervisory defendant must have been personally involved in a constitutional deprivation to be held liable under § 1983." *Brooks v. Prack*, No. 13-CV-6338, 2014 WL 7499458, at *7 (W.D.N.Y. Dec. 31, 2014) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). In *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit held:

> [P]ersonal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

More than a decade later, however, in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), the Supreme Court appeared to abrogate much of *Colon*, stating "vicarious liability is inapplicable to . . . § 1983

suits, [so] a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[13]

The Court need not decide the continued validity of each of the five *Colon* methods for demonstrating personal involvement of a supervisory defendant because even assuming arguendo all five continue to be valid, Plaintiff has still not demonstrated the personal involvement of any of the Supervisory Defendants in the incidents giving rise to his medical.  He has not alleged that the Supervisory Defendants participated directly in the acts comprising his medical claims (*Colon* prong one), or that the Supervisory Defendants directly participated in the adjudication of his various medical grievances and appeals (*Colon* prong two), or that the Supervisory Defendants created a policy or custom pursuant to which the allegedly unconstitutional medical treatment arose (*Colon* prong three).  Nor has Shepherd shown any facts suggesting that the Supervisory Defendants acted with gross negligence (*Colon* prong four).

As to *Colon*'s fifth prong, Plaintiff did send an April 21, 2008 letter directly to Defendant Fisher, in which he alleges "being denied medical treatment as well [as] mental health." (Pl.'s Opp. Ex. Fish. #1.)  Aside from this conclusory statement, however, the specific allegations recounted in Plaintiff's letter are not the subject of this suit, and instead relate to a variety of

---

[13] Since 2009, "[t]here has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent." *James v. Orange Cnty. Corr. Facility*, No. 09-CV-7226, 2011 WL 5834855, at *4 (S.D.N.Y. Nov. 18, 2011) (collecting cases); *Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part,* No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (collecting cases).  In a 2013 case, the Second Circuit appears to have reaffirmed at least part of the *Colon* test, stating that a "supervisory official may be liable in an action brought under § 1983 if he 'exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring,'" *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) (quoting *Colon*, 58 F.3d at 873 (emphasis omitted)); *cert. denied sub nom., Annucci v. Vincent*, 135 S. Ct. 948 (2015).  The continued validity of the second and fourth prongs of the *Colon* test remains uncertain. *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after *Iqbal*."); *Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) *aff'd*, 387 F. App'x 55 (2d Cir. 2010).

27

medical concerns regarding Plaintiff's knee. (*Id.*) As to the particular claims raised by Plaintiff in the lawsuit pending before this Court, a reasonable jury could not find that Plaintiff's letter constituted "information indicating that unconstitutional acts were occurring" or that any failure by Defendant Fisher to act on this information constituted "personal involvement" for the purposes of Section 1983. *Colon*, 58 F.3d at 873. Nor can Plaintiff show Defendants Ercole's or Koskowski's personal involvement on this basis, as he has provided no evidence indicating that they possessed specific information regarding the unconstitutional acts Plaintiff alleges.

In addition, because the Court finds that none of Plaintiff's allegations—aside from his allegation of deliberate indifference by Defendant Bentivegna—amount to potential constitutional violations, the question of the Supervisory Defendants' personal involvement is largely moot. Defendants' motion for summary judgment is thus granted as to those portions of Plaintiff's tenth, twelfth, and thirteenth causes of action concerning inadequate medical treatment.

### 5.  *Medical Confidentiality*

In his sixteenth cause of action, Plaintiff alleges that Defendant Bentivegna "knowingly, willingly and intentionally violated [his] right to medical confidentiality, by allowing inmates and officials to hear [his] medical complaints." (Am. Compl. 16.)

As a general matter, "[p]risoners do not have a constitutional right to complete confidentiality of medical records." *Cortes v. Johnson*, 114 F. Supp. 2d 182, 185 (W.D.N.Y. 2000). But prisoners "do not shed all fundamental protections of the Constitution at the prison gates." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). Instead, "prison officials can impinge on [the right to maintain the confidentiality of previously undisclosed medical information] only to the extent that their actions are 'reasonably related to legitimate penological interests.'" *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) (quoting *Turner v. Safley*, 482

U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.")).

In *Powell*, for instance, the Second Circuit held that disclosure of an inmate's HIV-positive and transsexual status "under certain circumstances and absent legitimate penological purposes, could constitute deliberate indifference to a substantial risk that such inmate would suffer serious harm at the hands of other inmates." *Id.* at 115. That holding, however, was premised on a finding that the inmate's confidential medical information was disclosed "as humor or gossip," a justification that evinced no legitimate penological interest, and that disclosure of the inmate's transsexual status "in the sexually charged atmosphere of most prison settings . . . might lead to inmate-on-inmate violence." *Id.* at 112–113.

Otherwise, even outside the prison context, the Second Circuit has stated "that the interest in the privacy of medical information will vary with the condition," and that "[c]onfidential medical conditions are those that are excruciatingly private and intimate [in] nature such as those likely to provoke . . . an intense desire to preserve one's medical confidentiality." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011) (quotation marks omitted) (second and third alterations in original). In *Matson*, the Second Circuit found that in the non-prison context, the plaintiff teacher was not entitled to a constitutionally-protected right to privacy as to her fibromyalgia because "although fibromyalgia is a serious medical condition, it does not carry with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition." *Id.* at 67 ("we have also focused our constitutional analysis on whether revealing one's condition would expose a person not to understanding or compassion but to *discrimination* and *intolerance*" (quotation marks omitted)).

Plaintiff generically alleges that he wanted to address his "medical issues" in private when he was seen by Dr. Bentivegna during sick call rounds while he was held in the SHU. (Pl.'s Aff. ¶ 25.) But he does not identify what specific medical issues were discussed. All of Plaintiff's allegations involving Dr. Bentivegna, however, concern treatment for his back pain. Back pain is more akin to the fibromyalgia in *Matson* then the HIV-positive and transsexual status in *Powell*. Plaintiff has not asserted—nor can the Court find—any elevated risk of inmate violence associated with the disclosure of Plaintiff's back pain, nor has Plaintiff asserted that Defendant Bentivegna disclosed his conditions as mere gossip, or for any other non-penological reason. *See Cortes*, 114 F. Supp. 2d at 185 ("Such innocuous concerns [as back and leg pain] simply do not present a similar risk to [plaintiff's] safety from other inmates, and do not compel the same heightened confidentiality as information concerning an inmate's HIV positive status or transsexualism."). The Court thus grants Defendants' motion for summary judgment as to this cause of action.

## II.    Plaintiff's *Milburn* Claims

Plaintiff's third cause of action alleges that Defendants Koenlgamann, Bernstein, and Fisher "failed to ensure that the stipulations in the judgment of Milburn v. [C]oughlin, 79CV5077 were adhered to and enforced, violat[ing] [his] rights." (Am. Compl. 14; *see id.* at ¶ 36.) *Milburn* was a "class action brought on behalf of 'all persons who are or will be inmates at Green Haven' to challenge the adequacy of Green Haven's health care services. The parties entered into a series of agreements culminating in 1991 in a 'modified consent decree,' which established guidelines for the provision of medical care at Green Haven." *Shire v. Greiner*, No. 02-CV-6061, 2007 WL 840472, at *13 n.6 (S.D.N.Y. Mar. 15, 2007). Nowhere does Plaintiff set forth the basis for his *Milburn* claim, but even if he had, "any application to enforce the *Milburn* consent decree must be

30

brought as a contempt proceeding before the district judge assigned to that case, not as a separate Section 1983 action." *Id.*[14]  Summary judgment is thus granted as counts three and twelve.

## III.    Sexual Abuse and Assault Claims

In his sixth cause of action, Plaintiff alleges that C.O.s Tweed, Sarles, and Ferrick knowingly and intentionally sexually assaulted him during five separate pat frisks.  Shepherd contends that the assaults by Sarles and Ferrick were in retaliation for complaints he had filed against them.  (Am. Compl. 14.)  Although the Court previously granted Tweed and Ferrick summary judgment, on reconsideration, the Court concludes that there are disputed issues of material fact, which if resolved in Shepherd's favor, would allow a reasonable factfinder to conclude that his constitutional rights were violated.  Defendants have not met their burden of proving either that they are entitled to qualified immunity or that Shepherd failed to exhaust any of these claims.  Defendants' motion for summary judgment as to count six is thus denied.

### A.  Reconsideration

On March 31, 2015, the Court granted Defendants' motion for summary judgment on Shepherd's sexual abuse claims, with one exception,[15] with an opinion to follow. (Dkt. 127.)  After delays due to the Court's attempt to find Shepherd a lawyer and the parties' efforts to resolve the matter, the Court ordered supplemental briefing on the dismissal of the sexual assault claims in light of the Second Circuit's decision in *Crawford v. Cuomo,* 796 F.3d 252 (2d Cir. 2015), decided in the intervening months.

---

[14] In his twelfth cause of action, Plaintiff alleges, in part, that Defendants Ercole and Fischer failed to ensure that Green Haven employees complied with the *Milburn* consent decree.  (Am. Compl. 16.) Because Plaintiff has not properly brought this *Milburn* claim, that cause of action is similarly precluded as a matter of law and hereby dismissed.

[15] The Court denied summary judgment as to the First Amendment retaliation claim against Sarles for the January 23, 2007 frisk search. Dkt. 127.

31

As a threshold matter, the Court must decide whether it should reconsider its prior ruling granting summary judgment to Defendants on these claims. Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288 (2d Cir. 2011) ("[A] district court has the authority to revise an interlocutory order, such as a partial denial of summary judgment, at any time before the entry of final judgment."). Although "there is a strong presumption against amendment of prior orders" due to the law of the case doctrine, *Bergerson*, 652 F.3d at 288, reconsideration is justified where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478 at 790).

Upon further consideration, and after reviewing the supplemental briefing from the parties, the Court is convinced that it should reconsider its prior grant of summary judgment on Plaintiff's sexual assault claims to correct a clear error and prevent manifest injustice. For the reasons that follow, Plaintiff's sexual assault allegations state a claim for a violation of his constitutional rights, and there are disputed issues of material fact making summary judgment inappropriate. Moreover, given the procedural posture of this case, Defendants will not be unduly prejudiced by this determination. *See United States v. Uccio*, 940 F.2d 753, 759 (2d Cir. 1991) ("Having given Uccio sufficient notice and an opportunity to be heard, it was well within the court's discretion to decline to deem itself bound by a ruling that it had come to view as wrong.").

32

**B. The Factual Record**

Shepherd alleges that between 2006 and 2008, he was sexually assaulted five times, and was directed to expose himself and threatened with sexual violence on two other occasions. First, Shepherd claims that on November 22, 2006, C.O. Tweed squeezed his penis, ran his hands between his buttocks cheeks, pressed on his anus, and whispered in Shepherd's ear that "he has a thing for big cocks." (Pl.'s Aff. ¶ 31.) Second, on November 23, 2006, Tweed again squeezed Shepherd's penis and fondled his testicles during a pat frisk—and when Shepherd asked to see a supervisor, Tweed "refused threatening to fuck [Shepherd] with his baton, threatening to hurt [him] if [he said] anything." (*Id.* ¶ 32).[16] Third, on January 23, 2007, when Shepherd was called to the mental health unit, Sarles allegedly pat frisked him in a "rough sexual manner using a hand scanner, pushing it between [Shepherd's] buttocks cheeks roughly saying he was going to fuck [him] in the ass with said scanner because [Shepherd] wrote [Sarles] up." (Pl.'s Aff. 30.) Fourth, on May 13, 2008, Shepherd claims Ferrick came to his cell, ordered him to submit to a pat frisk, which he did, and handcuffed him, ordering Shepherd to place his hands "high above the cell." (Pl.'s Aff. ¶ 34.) Then "Ferrick grabbed [Shepherd's] genitals and began squeezing them roughly making sexual comments." (Pl.'s Aff. ¶ 34; *see also* Am. Compl. ¶ 23; Schulze Decl. Ex. B 109:9–14.) Fifth, on June 10, 2008, Ferrick purportedly threatened Shepherd saying "the next time he searches [Shepherd], he will squeeze[] [his] testicles harder and he knows that [Shepherd] like[s] it." (Am. Compl. ¶ 23.) Sixth, on July 31, 2008, "Ferrick again squeezed [Shepherd's] testicles hard and roughly ran his hands between [Shepherd's] buttocks cheeks to [his] ass hole applying

---

[16] Defendants concede for purposes of this motion that on the two occasions described by Plaintiff, Tweed "touched plaintiff's clothed buttocks and 'put [plaintiff] on the wall, and then sta[r]ted to search [Plaintiff] in a sexual manner, grabbing [his] penis and genitals and squeezing it.'" (Defs.' R. 56.1 Statement ¶ 37 (quoting Schulze Decl. Ex. B 95:10–12).)

33

pressure for several seconds." (Pl.'s Aff. ¶ 34.) That assault resulted in testicular pain for which Shepherd was seen by sick call. (*Id*.) Seventh, hours later on July 31, 2008, Ferrick allegedly "bang[ed] on the window [of Shepherd's cell] telling [him] to pull [his] boxers down so he can see [his] dick because he knows [he has] a big dick, he felt it." (*Id*.) Ferrick "continued banging on the window urging [him] to take off [his] under-ware and turn around so he can see [his] penis." (Am. Compl. ¶ 23; *see also* Schulze Decl. Ex. B 109:24–110:9.) Plaintiff contends that Ferrick's conduct was in "further retaliation of . . . grievances and complaints filed against him." (Am. Compl. ¶ 23.) Plaintiff also alleges that he was "caus[ed] swelling and pain in [his] testicles and penis." (Am. Compl. 17.)[17]

### C. Legal Analysis

The sexual abuse and assault of prisoners is proscribed by the Eighth Amendment. *Crawford*, 796 F.3d at 257. "[C]ourts considering a prisoner's [Eighth Amendment] claim must ask both if the officials act[ed] with a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (second alteration original) (quotation marks omitted). As to the subjective prong, "where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Crawford*, 796 F.3d at 257 n.4 (quoting *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997)).

The objective component of the Eighth Amendment is contextual and "depends upon the claim at issue" because "the Eighth Amendment's prohibition of cruel and unusual punishments

---

[17] Defendants concede for purposes of their motion for summary judgment that on two occasions—May 13, 2008 and July 31, 2008—Ferrick squeezed Plaintiff's testicles during a frisk and during the later frisk Ferrick made "sexual comments." (Defs.' R. 56.1 Statement ¶¶ 42–43.)

draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Hudson*, 503 U.S. at 8 (quotation marks omitted). The objective harm required to state an Eighth Amendment claim based on conditions of confinement, for example, must be "extreme" because "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 9 (quotation marks omitted). In contrast,

> [i]n the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency *always are violated.* . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Id.* (emphasis added); *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (per curium) (explaining that in assessing an Eighth Amendment claim "[i]njury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). The Second Circuit has described "the malicious use of force to cause harm" as constituting a "per se" violation of the Eighth Amendment. *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999)).

"A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford*, 796 F.3d at 257. The *Crawford* court explained that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken

35

to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58 (citing *Whitley v. Albers,* 475 U.S. 312, 320–21 (1986) and *Hudson,* 503 U.S. at 6–7); *see also Wilkins*, 559 U.S. at 37 ("The 'core judicial inquiry,' we held, was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" (quoting *Hudson*, 503 U.S. at 7)). Furthermore, "even if contact between an officer and an inmate's genitalia was initially justified, if the officer finds no contraband, continued sexual contact may be actionable." *Crawford*, 796 F.3d at 257; *see also Boddie*, 105 F.3d at 861.

To determine the purpose of a correction officer's conduct during a frisk, the Second Circuit has looked to the timing of the frisk, the comments made during the frisk, and subsequent comments made by the officers. *See Crawford*, 796 F.3d at 258–59. Both plaintiffs in *Crawford* were found to have stated an Eighth Amendment claim when a corrections officer allegedly squeezed and fondled their penises during frisks because, under the facts alleged, there was no penological justification for those actions. 796 F.3d at 258–59. As to plaintiff Corley, the Circuit held that the timing of the frisk (in the middle of a visitation rather than at the beginning or the end) combined with the alleged statement by the corrections officer that he wanted to "make sure Mr. Corley did not have an erection" showed the frisk was gratuitous or sexually-motivated fondling. *Id.* at 258. Similarly, the Circuit explained that the frisk of plaintiff Crawford was not incidental to any legitimate duties, and the accompanying comments made by the corrections officer, including "that doesn't feel like a penis to me," "I'll run my hands up the crack of your ass if I want to," and subsequent taunts about having seen Crawford's penis, suggested the corrections officer "undertook the search to arouse himself or humiliate Crawford, or both." *Id.* at 259. In so doing, the *Crawford* court rejected as too narrow an interpretation of the *Boddie* case, the position

36

adopted by some district courts, that conduct must reach a high level of severity, such as direct contact with uncovered genitalia, physical injury, or penetration to implicate the Constitution. *Id.* at 257. "Under *Boddie*, no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes . . . is permitted by the Constitution." *Id.* at 258.[18]

Like the conduct at issue in *Crawford*, the alleged conduct of Tweed, Sarles, and Ferrick, if true, violates the Eighth Amendment. Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both.

### 1. Defendant C.O. Tweed

Plaintiff's Eighth Amendment claims against Tweed based on the allegedly improper frisks conducted on November 22 and 23, 2006 survive summary judgment. Shepherd alleges that during a pat frisk on November 22nd, Tweed "began touching my testicles and penis squeezing it in a trough [sic] manner and running his hands between my buttocks cheeks where his hand pressed on my anus hole. I protested and was ordered to shut the fuck up, as he whispered in my ear that he has a thing for big cocks." (Pl.'s Aff. ¶ 31.) On November 23rd, Shepherd alleges that Tweed "began to pat frisk me where he began fondling my testicles, squeezing my penis. I requested to

---

[18] Not all searches involving contact with an inmate's genitals are the proper subject of a lawsuit; "[i]ndeed prison security and safety may require frequent searches of an intensely personal nature." *Crawford*, 796 F.3d at 258; *see Shaw v. Prindle*, No. 15-CV-2883, 2016 WL 4578630, at *2 (2d Cir. Sept. 1, 2016) ("We cannot infer solely from the thoroughness of the search at issue here" that defendant "had intended to search [plaintiff] with intent to arouse or gratify [defendant's] sexual desires or to humiliate [plaintiff].").

37

see a supervisor and Twe[ed] refused threatening to fuck me with his baton, threatening to hurt me if I say anything." (Pl.'s Aff. ¶ 32.)

Even if these pat frisks initially had penological justification,[19] that justification would not immunize subsequent conduct that exceeded constitutional bounds. *See Crawford*, 796 F.3d at 257–58. The facts alleged here could support a finding that Tweed's squeezing and fondling of Shepherd's genitals went beyond the contact necessary to achieve the penological justification of the pat frisk. And from Tweed's alleged comment that "he has a thing for big cocks" and threat to "fuck [Shepherd] with his baton," a reasonable jury could conclude that the physical contact was undertaken for his own sexual gratification, to humiliate Shepherd, or both. If the disputed issues of fact were resolved in Shepherd's favor, a reasonable factfinder could thus conclude that Shepherd suffered an objective harm that violates the Constitution and that Defendant Tweed undertook to inflict that harm with a sufficiently culpable state of mind. *See Jumpp v. Terranova*, No. 3:16-CV-683, 2016 WL 2858775, at \*1–2 (D. Conn. May 16, 2016) (finding that "the complaint alleges sufficient facts to proceed" where plaintiff claimed that defendant on one occasion "slapp[ed] his buttocks and grabb[ed] his penis" and "threatened further sexual abuse" without any penological purpose).

### 2. *Defendant C.O. Sarles*

The facts Plaintiff alleges concerning Sarles may also constitute a violation of the Eighth Amendment. Plaintiff contends that Defendant Sarles conducted a pat frisk on January 23, 2007 in a "rough sexual manner using a hand scanner pushing it between [Shepherd's] buttock checks

---

[19] Both frisks occurred as Plaintiff returned from the inmate recreation area to his cell, and a grievance filed by Plaintiff on November 24, 2006 suggests that the purportedly improper frisk on November 22, 2006 occurred after Plaintiff's knee brace set off a metal detector. (Pl.'s Opp. Ex. Griev. #2.)

roughly saying he was going to fuck [Shepherd] in [his] ass with said scanner because [Shepherd] wrote him up." (Pl.'s Aff. 30.)  Based on that comment, a reasonable factfinder could conclude that Sarles touched Shepherd in a sexual manner to humiliate or intimidate Shepherd, not for a permissible penological purpose—a harm that objectively violates the Eighth Amendment. *See Hudson*, 503 U.S. at 8; *Goins v. Wosneack,* No. 6:15-CV-6234, 2016 WL 1271701, at *5 (W.D.N.Y. Mar. 30, 2016) (holding plaintiff stated an Eighth Amendment claim when she alleged the officer "intentionally touched her in an intimate area (i.e. by rubbing his penis against her buttocks) with the intent to gratify his own sexual desire and for no legitimate penological purpose.").  The subjective prong necessary for an Eighth Amendment violation is also met because Sarles' conduct, if credited, could be sufficient to establish a culpable state of mind. *See Crawford*, 796 F.3d at 257 n.4.

Defendant Sarles' motion for summary judgment is also denied as to Plaintiff's allegation that the January 23, 2007 frisk was in retaliation for speech protected by the First Amendment.[20] "To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quotation marks omitted) (alteration in original).

Here, Shepherd asserts that Sarles expressly linked the January 23, 2007 sexual assault and related threat to Shepherd's prior complaints against him.  Shepherd contends that Sarles said "he was going to fuck [Shepherd] in the ass with said [hand] scanner because [Shepherd] wrote him up." (Pl.'s Aff. ¶ 30; Schulze Decl. Ex. B 100:12–102:19.)  That allegation is sufficient to satisfy

---

[20] The Court denied summary judgment on this claim on March 31, 2015. (Dkt. 127.)

Plaintiff's initial "burden of showing that the protected conduct was a substantial or motivating factor in the prison officials' disciplinary decision." *Holland*, 758 F.3d at 225 (quotation marks omitted). Because Defendants do not address Plaintiff's retaliation claims at all, they have not met their "burden of establishing that the disciplinary action would have occurred even absent the retaliatory motivation." *Id.* at 226 (quotation marks omitted). Ordinarily, the time between Plaintiff's letters of complaint regarding the prior frisk by Defendant Sarles on January18, 2006 and the alleged retaliatory frisk on January 23, 2007 might be "too attenuated to establish a causal relationship." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). But here, a reasonable factfinder could infer a causal relationship based on Plaintiff's assertion that Sarles expressly linked these events in his statements to Plaintiff.[21]

### 3. *Defendant C.O. Ferrick*

A reasonable factfinder could also find that the allegedly improper frisks conducted by Ferrick, each of which involved "rough" contact with Plaintiff's genitals and were accompanied by violent threats and abusive sexual language, violated Shepherd's Eighth Amendment rights. (*See* Pl.'s Aff. ¶ 34.) The first challenged frisk occurred on May 13, 2008 in Shepherd's cell. While Shepherd was handcuffed, Ferrick allegedly squeezed and grabbed his genitals while making sexual comments. Shepherd complained about that assault, and thereafter, on June 10, 2008, Ferrick told him that "next time he searches [Shepherd] he will squeeze[] [his] testicles harder and [Ferrick] knows that [Shepherd] like[s] it." (Amend. Comp. ¶ 23.) Then on July 31, 2008, Ferrick allegedly "again squeezed [Shepherd's] testicles hard and roughly ran his hands

---

[21] Defendant Sarles, moreover, is not entitled to qualified immunity on Plaintiff's retaliation claim—at least not on the basis of the record now before the Court. "Qualified immunity is an affirmative defense that must be pled and proved by the defendant," *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996), and Defendant Sarles has not even attempted to satisfy this burden here, as he has argued only that he is entitled to qualified immunity for Plaintiff's excessive force claims, discussed *infra*. (Defs.' Mem. 27.)

between [Shepherd's] buttocks checks to [his] ass hole applying pressure for several seconds" during a pat frisk. (Pl.'s Aff. ¶ 34.) That assault resulted in testicular pain, for which Shepherd was seen by sick call. (*Id.*) Shepherd also asserts that several hours later, Ferrick banged on the window of his cell "telling [Shepherd] to pull [his] boxers down so he can see [Shepherd's] dick because he knows [he has] a big dick, he felt it." (*Id.*; Am. Compl. ¶ 23.) A reasonable factfinder could find that there is no penological purpose for squeezing an inmate's testicles "hard," applying extended pressure to his anus, threatening sexual assault, or making comments regarding the size of his penis, and could conclude from such conduct that the defendant acted with a sufficiently culpable state of mind to violate the Eighth Amendment. *See Allah v. Morrison*, No. 14-CV-6735L, 2016 WL 4017340, at \*4 (W.D.N.Y. July 22, 2016) ("Allah has plausibly alleged that Morrison intentionally grabbed his genitals for no legitimate penological purpose and subjected him to offensive sexual taunts. Such allegations are sufficient to state a claim for sexual harassment in violation of Allah's Eighth Amendment rights."); *see also Crawford*, 796 F.3d at 257.

Summary judgment is granted to Defendant Ferrick as to Plaintiff's claims of retaliation by him, however. Claims of retaliation "must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *See Friedl v. City of New York*, 210 F.3d 79, 86 (2d Cir. 2000) (quotation marks omitted). Plaintiff has provided no evidence of retaliation beyond a conclusory allegation in his Amended Complaint. (*See* Am. Compl. ¶ 23 ("Ferrick[']s actions were in further retaliation of the grievances and complaints filed against him.").) Plaintiff has thus failed to state a cognizable claim for retaliation.

### 4.  *Qualified Immunity*

Having determined that Shepherd raises genuine issues of material fact as to whether

Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, the Court now turns to whether Defendants are entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations and quotation marks omitted). "The contours of the right [alleged to have been violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. Where "no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," *Saucier*, 533 U.S. at 205, not to insulate officers "who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants argue that even if Shepherd states a claim for a violation of the Eighth Amendment under *Crawford*, Defendants are entitled to qualified immunity because "[a]t the time these incidents occurred, it was not clearly established that the alleged conduct would have violated the Eighth Amendment . . . [because] binding precedent, *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997), established that such conduct was not an Eighth Amendment violation." (Opp. to Pl.'s Ltr. Brief at 5 (Dkt. 163).) The Court disagrees.

*Crawford* did not change the law. As the *Crawford* Court itself stated: "[t]he standard set

42

forth in *Boddie* . . . remains the same today." *Crawford*, 796 F.3d at 255; *see id.* at 256 ("*Boddie* recognized that a single act of sexual abuse may violate the Eighth Amendment if, as in this case, it is entirely gratuitous and devoid of penological purpose."); *id.* at 258 ("Under *Boddie*, no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes, as was the case here—is permitted by the Constitution."); *cf. Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (describing *Crawford* as "giv[ing] new guidance on the meaning of *Boddie*").

*Boddie* itself clearly establishes that the officers' conduct alleged here, if true, violates the Eighth Amendment. *Boddie* made "clear that the sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim." 105 F.3d at 859. Specifically, *Boddie* set out the legal standard for when an officer violates the Eighth Amendment by such conduct: "there can be no doubt" that the objective prong is met by "severe or repetitive sexual abuse of an inmate by a prison officer." *Id.* at 861. "[S]exual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and 'is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). The subjective prong is met by claims of sexual abuse because "a prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights." *Id.* "Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.* The court in *Crawford* described its holding in *Boddie* as follows:

> In *Boddie*, we left no doubt that sexual abuse by a corrections officer can give rise to an Eighth Amendment claim. . . . *Boddie* made clear that "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute

> an Eighth Amendment violations." . . . *Boddie* also made clear that "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind."

*Crawford*, 796 F.3d at 257 & n.4 (last alteration in original) (quoting *Boddie*, 105 F.3d at 859, 861).

In *Boddie* the court described the conduct plaintiff complained of there as "isolated episodes of harassment and touching." *Id.* at 861. Boddie's allegations were as follows: a female corrections officer "made a statement" that Boddie believed amounted to "a pass" at him but about which he "could not be sure;" the next day, the female officer "squeezed his hand, touched his penis, and said, '[Y]ou know your [sic] sexy black devil, I like you.'" *Id.* at 859–60 (alterations in original). A few weeks later, the same officer stopped Boddie, accused him of wearing an orange sweatshirt, a color inmates were prohibited from wearing, and told him to take off the sweatshirt. *Id.* at 860. Boddie refused because the hallway was cold, and he told the officer he would give the sweatshirt to her when they returned to his cellblock. *Id.* The officer stopped him, and twice "bump[ed] into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." *Id.* (second, third, and fourth alterations in original). When he tried to pass her again, the officer again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door." *Id* (alterations in original). The Second Circuit held that the alleged actions were "despicable" but did not involve a harm of federal constitutional proportions.

*Id.* at 861.[22]

The facts Shepherd alleges are far more serious, threatening, and more repetitive than those alleged by the plaintiff in *Boddie*.  Shepherd asserts that his genitals were squeezed, fondled, and grabbed, prolonged pressure was applied to his anus, and phallic objects were rubbed roughly between his buttock cheeks by officers who threatened sexual violence, including to rape him with a baton or hand scanner.  On one occasion, Shepherd says that he was in such pain as a result of the forceful squeezing of his testicles that he was seen by sick call.  Such conduct simply more egregious than the "isolated episodes of harassment and touching" that the *Boddie* court addressed.  Moreover, the alleged seven incidents of sexual abuse, five of which involved sexual contact, are more repetitious than what Boddie experienced.  While recognizing that several officers are alleged to have been involved in the sexual assaults of Shepherd, each officer's conduct on its own was so severe that a reasonable officer would know it was "objectively, sufficiently serious" to violate the Eighth Amendment. *Boddie*, 105 F.3d at 861.

*Boddie*'s announcement of the legal standard by which sexual assault allegations were to be considered under the Eighth Amendment made "the contours of a right" not to be sexually assaulted by a corrections officer "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (alterations and

---

[22] Notably, the conduct the female officer was accused of in *Boddie* may not have violated New York State law as it existed in 1997 because at that time, the law only criminalized sex offenses committed by men.  Sexual misconduct was defined by New York State law as when "a male . . . engages in sexual intercourse with a female without her consent" or when "he engages in deviate sexual intercourse with another person without the latter's consent." 1965 Sess. Law News of N.Y. Ch. 1030.  A person was guilty of sexual abuse when "he subjects another person to sexual contact." *Id.*  In 2000, New York State recognized that women, as well as men, could perpetrate sexual assault.  2000 Sess. Law News of N.Y. Ch. 1 (changing the law so that a person can be guilty of sexual misconduct and sexual abuse if "he or she" commits the crime).  As the Second Circuit observed in *Crawford*, the gender of the officer accused of assault in *Boddie* may have been significant to the court, "today—more so than 18 years ago—we recognize that a *female* corrections officer is equally capable of sexually abusing a male inmate and the harm that could result from such abuse." 796 F.3d at 260 n.10.

quotation marks omitted).[23]  Applying the legal standard from *Boddie* to the facts of this case, the sexual assaults of Shepherd were both objectively "severe" and "repetitive."  These correction officers must have known it was impermissible to "squeeze[]," "fondle[]," and "grab[]," Shepherd's penis and testicles, apply prolonged pressure to his anus, and threaten to "fuck [him] in the ass" with a foreign object, amongst other threats of sexual violence.  (Pl.'s Aff. ¶¶ 30–34.) "[N]o legitimate law enforcement or penological purpose can be inferred from the [D]efendant[s'] alleged conduct," and Defendants have offered none; thus the abuse itself, if true, is "sufficient evidence of a culpable state of mind."  *Boddie*, 105 F.3d at 861.  Under the clearly established legal standard in *Boddie*, every reasonable officer was on notice that intentionally engaging in the conduct alleged was unlawful.  *See id*; *Hope*, 536 U.S. at 739 ("qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001))).

Even if reliance on *Boddie* alone was insufficient for the officers to have been on notice that their conduct was unlawful, the Court would deny Defendants qualified immunity for two additional reasons.  First, Supreme Court precedent has long made clear that the malicious use of force to cause harm violates the Eighth Amendment.  Second, the officers' conduct at the time it was alleged to have been committed was a crime under New York State law, and eliminating such conduct had been the goal of national legislation, reaffirming the Court's conclusion that any reasonable officer would have had fair warning that this behavior would violate an inmate's rights.

---

[23] As the Supreme Court stated in *al-Kidd*, for a right to be clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  563 U.S. at 741; *see also Jennings v. Jones*, 499 F.3d 2, 17 n.18 (1st Cir. 2007) ("It is true that the *right* allegedly violated must be defined at the appropriate level of specificity before a court can determine if it is clearly established,' but this requirement does not imply that the relevant *case law* must be particularized to address the alleged violation.  Rather, once the right allegedly violated has been defined, the court must examine whether the unlawfulness of particular conduct will be apparent *ex ante* to reasonable public officials." (citations omitted) (quoting *Wilson*, 526 U.S. at 613, 615).

Supreme Court precedent has long clearly established that the intentional infliction of harm without penological purpose, regardless of the injury alleged, violates the Eighth Amendment. "The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment," *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation marks and alterations omitted), and "[a]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotation marks omitted)). There is no "injury threshold" that a prisoner must meet to state an Eighth Amendment claim for excessive force. *Wilkins*, 599 U.S. at 39; *see id.* at 41 ("*Hudson* . . . discarded the requirement of serious injury . . . the Court concluded that force, rather than injury, is the relevant inquiry, and that a prisoner who alleges excessive force at the hands of prison officials and suffers nothing more than *de minimis* injury can state a claim under the Eighth Amendment." (Thomas, *J.*, concurring in judgment)); *cf. Harris*, 818 F.3d at 64 ("[C]ertain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations per se. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." (quoting *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999)); *cf. Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002) ("[I]t is clearly established that all infliction of excessive force on a prisoner sadistically and maliciously for the very purpose of causing harm and which does cause harm violates the Cruel and Unusual Punishment Clause. So, where this type of constitutional violation is established there is no room for qualified immunity."). Every reasonable officer would thus know that engaging in the physical conduct alleged here, while making explicit threats of sexual violence, was a malicious use of force that constituted cruel and unusual punishment and violates an inmate's Eighth Amendment rights.

47

Moreover, the fact that the alleged conduct constituted a crime under New York State law,[24] and was the subject of national legislation aimed at stopping such conduct in prisons,[25] reinforces the conclusion that every reasonable officer would have known that it violated the Eighth Amendment. In assessing what every reasonable officer would have known, courts consider not only case law interpreting the constitutional right alleged to be violated, but other precedent that would put officers on notice that their conduct was inappropriate, including an agency directive, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004), state regulation, *Hope*, 536 U.S. at 744, and a Department of Justice report, *id.* at 744–45. Although "officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision, we may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights." *Okin*, 577 F.3d at 433–34 (citations and alterations omitted). If a reasonable officer had fair warning, qualified immunity is not appropriate because it is not the purpose of qualified immunity to protect

---

[24] 2003 Session Law News of N.Y. Ch. 264 provides: "A person is guilty of forcible touching when such person intentionally, and for no legitimate purpose: 1. forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire; . . . For the purposes of this section, forcible touching includes squeezing, grabbing or pinching. Forcible touching is a class A misdemeanor." (codified at N.Y. Penal Law § 130.52).

[25] In 2003, the United States Congress unanimously passed the Prison Rape Elimination Act ("PREA"), which defines "rape" to include "sexual fondling." 42 U.S.C. § 15609(9). "The term "sexual fondling" means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification." *See id.* § 15609(11). Amongst PREA's defined purposes is to "protect the Eighth Amendment rights of Federal, State, and local prisoners," *Id.* § 15602(7), based on Congress's finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution." *Id.* § 15601(13). Other purposes of the PREA include "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "mak[ing] the prevention of prison rape a top priority in each prison system." *Id.* § 15602(1), (2).

"those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 238–39 (S.D.N.Y. 2005) ("A corrections officer who sexually assaults a prison inmate does not mistakenly judge how he should carry out his duties; instead, such conduct blatantly disregards a New York State criminal statute and Second Circuit case law.").[26]

The officers here had fair notice at the time of the conduct alleged that such conduct violates the Eighth Amendment. Defendants' request for qualified immunity was is denied.

### 5. *Exhaustion*

The Prison Litigation Reform Act instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Failure to exhaust administrative remedies is an affirmative defense . . . not a pleading requirement," *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). Even when defendants meet this burden, however, failure to exhaust may still be excused where an inmate shows that administrative remedies were not in fact available to the inmate. *Id.* at 123. As the Supreme Court recently explained, "an inmate's duty to exhaust 'available' remedies does not come into play" when "an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). As the Second Circuit explained, the Supreme Court noted three circumstances, where an administrative remedy may be "unavailable":

---

[26] Defendants also argue that the existence of district court cases, which Defendants contend involved "similar factual allegations," but reached the conclusion that there was no constitutional violation, show that the law was not clearly established. (Opp. to Pl.'s Ltr. Brief at 5–6 (Dkt. 163).) The Court disagrees. In determining whether a right has been established with reasonable clarity, this Court must look to Supreme Court and Second Circuit precedent. *See, e.g., Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011); *see also Hope v. Pelzer*, 536 U.S. 730, 747, 756–27 (2002).

> First, an administrative remedy may be unavailable when "it
> operates as a simple dead end—with officers unable or consistently
> unwilling to provide any relief to aggrieved inmates." Second, "an
> administrative scheme might be so opaque that it becomes,
> practically speaking, incapable of use." In other words, "some
> mechanism exists to provide relief, but no ordinary prisoner can
> discern or navigate it." Third, an administrative remedy may be
> unavailable "when prison administrators thwart inmates from
> taking advantage of a grievance process through machination,
> misrepresentation, or intimidation."

*Williams*, 829 F.3d 118, 123–24 (citations omitted) (quoting *Ross*, 136 S. Ct. at 1859). As the

Second Circuit noted, "the three circumstances discussed in *Ross* do not appear to be exhaustive,

given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of that

case." *Id.* at 124 n.2. Thus, there may be other circumstances that could "render an otherwise

available administrative remedy actually incapable of use." *Id.*

Defendants contend that Plaintiff did not properly appeal his grievances regarding the

alleged improper frisks by Tweed and Sarles, or the July 31, 2008 alleged improper frisk conducted

by Ferrick, (Hale Decl. ¶¶ 8–13), but appear to concede that Plaintiff did properly appeal his

grievance regarding Ferrick's May 13, 2008 frisk. (*See* Opp. to Pl.'s Ltr. Brief at 7–8 (Dkt. 163).)

Plaintiff asserts that he did file grievances and appeals regarding each of the instances of excessive

use of force and retaliation that he now presses before the Court. (*See* Pl.'s Ltr. Brief at 18 n.11–

13 (Dkt. 160).)

In light of the factual disputes about the grievances filed by Shepherd, the Court previously

determined that a limited evidentiary hearing was appropriate. (*See* Tr. of Apr. 17, 2015

Teleconference at 5 (Dkt. 149).) There continue to be factual disputes that prevent the Court from

deciding whether Shepherd exhausted his claims and/or whether the "administrative remed[ies],

although officially on the books," were actually available to Shepherd. *Ross v. Blake*, 136 S. Ct.

at 1859. Whether these claims were properly exhausted is a disputed issue of fact reserved for the

Court and not the jury. *See Messa v. Goord*, 652 F.3d 305, 309–310 (2d Cir. 2011). Accordingly, the Court's will schedule and conduct a limited evidentiary hearing on the issue of exhaustion.[27] *See Gomez v. Chill*, No. 11-CV-6844, 2015 WL 1853110, at *6 (S.D.N.Y. Apr. 17, 2015), *report and recommendation adopted,* 2015 WL 3862709 (S.D.N.Y. June 9, 2015). Defendants' motion for summary judgment based on Shepherd's alleged failed to exhaust his claims of sexual assault is denied.

## IV. Plaintiff's Free Exercise Claims

Plaintiff is a practicing Rastafarian, and several of his claims relate to alleged violations of his religious rights. In his seventh cause of action, Plaintiff alleges that Green Haven Deputy of Security Koskowski, Sergeants Kelly, Scott, and Alexander, Lieutenants La Ports, Towkartz, Wilson, and Hann, and C.O.s Filipponi, Bonafede, Raetina, Dryer, Trembath, Miller, Swan, Castine, Sample, and Freeman "knowingly willingly and intentionally caused [his] covenant and holy temple to be desecrated by touching, ripping/tearing [his] dread locks in violation of [the] free exercise clause." (Am. Compl. 15.)[28] Similarly, in Plaintiff's ninth cause of action, he alleges that Deputy Koskowski, Sergeants Scott and Alexander, Lieutenants Towkartz, Hann, Wilson, and La Ports, and C.O.s Trembath, Bonafede, Miller, Freeman, Dryer, Castine, Swan, and Sample "failed to stop their subordinates from ripping/tearing and desecrating [his] dread locks, and knowingly allowed [the] free exercise clause . . . to be violated." (*Id.*) In his fifteenth cause of

---

[27] Plaintiff—now with the benefit of counsel—argues that "there has not been sufficient discovery to fully develop the record" on the issue of exhaustion and there is a "need for additional discovery." (*See* Pl.'s Reply Ltr. Brief at 7 (Dkt. 166).) On February 25, 2016 the Court reopened discovery on the "limited issue of exhaustion for those claims that survived the motion for summary judgment." (Dkt. 171.)

[28] Although Plaintiff names C.O. Dryer in his cause of action, he is not named as a defendant in the case and Plaintiff has not sought leave to amend his complaint to add Dryer as a defendant pursuant to Federal Rule of Civil Procedure 15. To the extent Plaintiff asserts claims against C.O. Dryer, these claims are not properly before the Court and will not be considered.

action, Plaintiff also alleges, in part, that Defendant Hann "discriminated against [him] due to [his] religion." (*Id.* 16.)

## A. The Factual Record

As a Rastafarian, Plaintiff considers his hair sacred; his beliefs do not allow for his hair to be cut, or for it to be touched by others. (Pl.'s Aff. ¶¶ 1, 37; Am. Compl. ¶ 25.) Plaintiff alleges that his hair was improperly searched by Green Haven guards on five separate occasions: an unspecified date in February 2007 (Am. Compl. ¶ 26); March 12, 2007 (*id.* ¶ 27); February 28, 2008 (*id.* ¶¶ 28–29); March 6, 2008 (*id.* ¶ 30); and March 15, 2008 (*id.* ¶ 31). As Defendants concede, Plaintiff was also denied religious meals on two occasions: on October 7, 2005, during celebrations for the holiday of Negust, (Pl.'s Aff. ¶ 35) and on May 5, 2008, during celebrations for Fasika, (Am. Compl. ¶ 32).

### *1. Searches of Plaintiff's Hair*

During the time period in question, Plaintiff had "an abundance of hair . . . matted together," into dread locks. (Pl.'s Aff. ¶ 43.) An incident report provided by Defendants suggests that, Plaintiff's hair would, unfurled, stretch to six feet (Schulze Decl. Ex. E at 35), and a video of the February 28, 2008 search of Plaintiff's hair shows that his hair consisted of a single, large matted dreadlock—what Plaintiff refers to as the Bongo dreadlock style (*id.* Ex. I; Pl.'s Aff. ¶ 36.). As both parties concede, there were "empty spaces" within this large mass of hair where Plaintiff's hair did not "reach all the way to [his] scalp," which Plaintiff asserts C.O. Tweed created by improperly ripping Plaintiff's hair in 2003. (Pl.'s Aff. ¶ 44.) Defendants, meanwhile, assert that these "empty spaces" pose a potential security risk, providing places in which "the inmate could conceal fairly large objects, such as weapons and drugs." (Schulze Decl. Ex. G ¶ 3.)

DOCCS protocols afford Rastafarian inmates the opportunity to avoid searches by prison officials if they "run their fingers through their hair in a manner sufficient to demonstrate that contraband is not concealed therein." (*Id.* ¶ 4; *see also* Schulze Decl. Ex. L § III(B)(1).) If inmates comply with this so-called "pat frisk" procedure and can "demonstrate the absence of contraband," officers will then not search their hair. (Schulze Decl. Ex. G ¶ 5.) Where an inmate refuses to comply with this procedure, however, "security staff must then touch the hair to identify concealment pockets and detect foreign objects"—what is referred to as a "strip search." (Schulze Decl. Ex. H ¶ 8; *id.* Ex. L § III(D)(1).) Even where an inmate complies with the initial pat frisk procedure, moreover, officers may supplement this procedure by use of a hand-held metal detector. (Schulze Decl. Ex. L § III(B)(2).) Defendants' exhibits also suggest that, where there is probable cause for an officer to believe that "an inmate is hiding contraband on his or her body," officers can conduct a strip search without first providing the inmate an opportunity to demonstrate the absence of contraband. (*Id.* § III(D), (F).)

Defendants assert that this set of procedures "is essential to [DOCCS'] ongoing effort to maintain security of the facility, safety of the inmates, employees, visitors and the community, inmate discipline," and that it reflects DOCCS' effort to "accommodate[] [religious strictures] to the extent that it can reasonably do so without compromising its need to control the possession/use of contraband." (Schulze Decl. Ex. H ¶ 8.) Defendants also assert that these procedures represent the "least intrusive means available to counteract a well known and frequently used method of concealing contraband." (Schulze Decl. Ex. H ¶ 9.) In an affidavit from non-party Colonel Kirkpatrick, Defendants provide an illustrative list of incidents in which drugs, weapons, and other contraband, have been recovered from inmates during such searches. (*Id.*)

Despite these carefully tailored procedural protections, Plaintiff asserts he was "constantly harassed" because of his dreadlocks while in Green Haven, and that "officials were always making degrading comments regarding [his] hair." (Pl.'s Aff. ¶ 36.) He alleges that Lieutenant Hann, on several separate occasions, "sent her subordinates who threatened [him] about cutting [his] hair," and that on January 16, 2007, these same, unnamed officers were sent to take pictures of his hair. (*Id.*) On January 16, 2007, Plaintiff sent a "formal complaint" to the superintendent of Green Haven—presumably Ercole—regarding this purported harassment, which requested that it "be stopped immediately." (Pl.'s Opp. Ex. G-H Supt.) In his complaint, Plaintiff also informed the superintendent of a court order "stating that [his] hair must not be cut due to the fact that [he is] a Rastafarian." (*Id.*) Plaintiff has not provided a copy of this court order.

On January 17, 2007, Plaintiff wrote a similar letter to DOCCS Commissioner Goord. (Pl.'s Opp. Ex. Goord #3.) In the letter, he asserts that Lieutenant Hann ordered her subordinates to "cut [Plaintiff's] dreadlocks" or "issue [Plaintiff] a misbehavior report." (*Id.*) He also asserts that the photographs of his hair were taken to "determine whether [his] hair [was] in compliance with the directives, policy procedure," and that "every day" the officers "call [his] hair shit and make foul comments about [his] dreadlocks." (*Id.*) Plaintiff's letter further requests an "immediate investigation," and references his January 16, 2007 complaint to Green Haven's superintendent. (*Id.*)

In February 2007, Plaintiff contends that he was returning from Green Haven's clinic with several other prisoners, "when numerous officers began searching all of the prisoners and the officer who was searching [Shepherd] began pulling on [his] hair ripping several locks out." (Pl.'s Aff. ¶ 37.) Plaintiff claims that Lieutenant Towkartz observed this search, and that he informed Lieutenant Towkartz that he considered the search a "violation of [his] religious belief." (*Id.*)

Towkartz allegedly responded by explaining to Plaintiff that the searching officer "did nothing wrong even though [Plaintiff's] hair was ripped out," and then ordered Plaintiff to "shut up and face the wall." (*Id.*)

On March 12, 2007, Plaintiff asserts he was again searched, along with several other prisoners, on his way to evening recreation. (*Id.* ¶ 38.) Plaintiff contends that the searching officers, C.O.s Sample and Castine, "ran their hands under [his] boots bottom and began touching [his] hair," (Am. Compl. ¶ 27) leading him to "protest making the officer aware of [his] religious beliefs and it was against [his] religion to have [his] hair touched," (Pl.'s Aff. ¶ 38.) Plaintiff asserts that, in response, the searching officers "began pulling [his] hair roughly which caused [his] hair to be ripped." (*Id.*) Plaintiff also asserts that, during the search, he heard Sergeant Alexander comment that his "hair was dirty and smelled like shit and the Rastafarians are assholes whose hair should be cut off." (*Id.* ¶ 39.)

Plaintiff claims he later reported the searching officers for improperly touching and ripping his hair, and Sergeant Alexander, for his "degrading comments." (*Id.*) In a formal grievance filed on March 16, 2007 regarding the February 2007 and March 12, 2007 searches of his hair, Plaintiff describes harassment regarding his hair beginning in December 2006, when the "administration [of Green Haven] started a crusade" against him. (Pl.'s Opp. Ex. Griev. #5.) Plaintiff alleges that "an attorney" spoke with Abuna Fox, a Rastafarian priest and DOCCS' Statewide Rastafarian Coordinator, who purportedly told that attorney that Plaintiff's hair "was legal and due to his religious beliefs[] he did not have to cut his hair." (*Id.*) In his grievance, Plaintiff also requested that new officers be trained not to "touch, grab or pull [Plaintiff's] hair any time they . . . conduct a search of his person[]," and that the officers "change their gloves after searching a prisoner." (*Id.*)

55

Also on March 16, 2007, Plaintiff's wife received a letter from DOCCS Deputy Commissioner Lucien J. Leclaire, Jr., informing her that "allegations of harassment concerning [Plaintiff's] hairstyle w[ere] investigated," and that these investigations revealed "a legitimate security concern regarding the frisking of [Plaintiff's] hair." (Pl.'s Opp. Ex. F.) Deputy Commissioner Leclaire further informed Plaintiff's wife that photographs of Shepherd's hair "were taken and forwarded to the Department's Counsel's Office for review," and that Plaintiff had been interviewed regarding his hair. (*Id.*) The letter further acknowledged that Fox had met with Plaintiff, and that Green Haven officials had "been advised" that Fox considered Plaintiff's hairstyle to be "within the guidelines of the Rastafarian religion." (*Id.*)

Plaintiff's hair was again searched on February 28, 2008. The circumstances surrounding this search are both complicated and sharply disputed.

Plaintiff asserts that on February 28, 2008, he was taken from his cell and brought to a downstairs room, the G block bathroom, where Sergeant Kelly and C.O. Filipponi strip searched him, using a hand-held metal detector to scan his hair. (Pl.'s Aff. ¶ 40; *see also* Schulze Decl. Ex. F. at 18:19–20.) Plaintiff asserts that the scanner did not detect any contraband, but that he was nonetheless taken to "F & G corridor" where he was subject to additional searching by Lieutenants Towkartz and La Ports. (*See* Pl.'s Aff. ¶ 40; Pl.'s Opp. Ex. G8 (describing search as a pat frisk— not a strip search—and identifying the site of this frisk as the "F&G Strip Frisk Room" in DOC report signed by W. Kelly); *see also* Schulze Decl. Ex. F. at 18:21.) In particular, Plaintiff claims that Green Haven officials sat him in a chair and ordered him to "rip [his] hair in order to see [his] scalp," but that he refused to comply with this order. (Pl.'s Aff. ¶ 41.) During this search, Plaintiff was purportedly handcuffed, and he claims that a guard positioned behind him improperly tampered with his hair, which he realized only after this officer ripped a portion of his hair. (*Id.*)

56

While in "F & G corridor," Plaintiff also claims to have heard Lieutenants Towkartz and La Ports tell Sergeant Kelly and C.O. Filipponi that they did "not care what happens as long as they find contraband in [Plaintiff's] hair." (*Id.* ¶ 42.)

Plaintiff was then purportedly taken in handcuffs to Green Haven's clinic, where he was placed in a room with Sergeant Kelly and C.O. Filipponi. (*Id.* ¶ 43; *see also* Schulze Decl. Ex. F. at 18:21–24.) Plaintiff asserts that while Sergeant Kelly spoke with him, C.O. Filipponi again tampered with his hair, which he became aware of only after he felt a "tugging of [his] hair." (Pl.'s Aff. ¶ 43.)

After two hours in the clinic room, Plaintiff was allegedly taken to Green Haven's hospital, where he was again strip searched and shackled. (Pl.'s Aff. ¶ 45.) Sergeant Kelly appears to have reported Plaintiff's failure to comply with DOCCS pat frisk procedures to the Green Haven Watch Commander, who contacted Green Haven's Deputy of Security, Koskowski. Deputy Koskowski directed the officers to frisk Plaintiff's hair if Plaintiff did not comply with a further direction to run his own fingers through his hair. (Defs.' R. 56.1 Statement ¶ 57.) Deputy Koskowski further insisted the frisk be videotaped. (*Id.*) Lieutenant La Ports purportedly communicated these orders to Plaintiff, telling Plaintiff that authorization had been given to search his hair, and that he could either "assist [the officers] or . . . have the guards hold [him] down and search[] [his] hair." (Pl.'s Aff. ¶ 45.) Plaintiff asserts that he attempted to comply with these directions, but "was not willing to rip[] [his] hair." (*Id.*) Accordingly, the officers searched Plaintiff's hair for him. C.O. Miller "held the handcuffs and chain while another went in [his] hair tearing and ripping [his] hair," (*id.* ¶ 46), and C.O. Bonafede videotaped this search (*see* Schulze Decl. Ex. I), while C.O. Trembath observed (Am. Compl. ¶ 29).

Plaintiff acknowledges that the searching officer alleged that he found two black balloons in Shepherd's hair, one empty, and another containing an unknown substance. (Pl.'s Aff. ¶ 46.) Both balloons were shown to the camera, as Plaintiff concedes, although he argues that the substance inside of them was not properly videotaped. (*Id.* ¶ 47.) Plaintiff also contends that these balloons were planted on him by Lieutenant Towkartz or C.O. Filipponi, the officers that tampered with his hair during the searches in "F & G corridor" and in the clinic. (Am. Compl. ¶ 29; *see also* Schulze Decl. Ex. F at 19:1–18.) The affidavit of James Odam, a fellow inmate, offers some corroboration for Shepherd's assertion that Lieutenant Towkartz planted the contraband. (*See* Pl.'s Opp. Ex. Aff. of Odam (recounting Lieutenant Towkartz's alleged admission on May 16, 2008, "Yeah, that's me, I'm the one who put that Junk in your boy Shepherd's hair," and, "[w]hen you get back to your cell ask that asshole 'Shepherd' how he liked that meth I hooked him up with, for me, would you.").) Plaintiff asserts that he "experienced headaches" as a consequence of the February 28, 2008 search of his hair. (*Id.*)

Defendants characterize the February 28, 2008 search differently. Specifically, they assert that "[o]n or about" February 28, 2008, DOCCS received a tip—alternately described as a "confidential" or "anonymous" letter—that Plaintiff had hidden illicit drugs in his hair. (Schulze Decl. Ex. E at 24,[29] 25,[30] 35, Ex. F at 52:11–20.) Defendants assert that Sergeant Kelly, after verifying the reliability of this tip, authorized C.O. Filipponi to conduct a pat frisk of Plaintiff. (Schulze Decl. Ex. E at 24.) Some evidence presented by Defendants suggests that this initial pat frisk revealed a bulge in Plaintiff's groin area, on the basis of which a strip search was conducted, but that this search failed to reveal any contraband. (*Id.* at 35; *see also* Pl.'s Opp. Ex. G8.)

---

[29] This page of Defendants' exhibit was also submitted by Plaintiff as Pl.'s Opp. Ex. G4.

[30] This page of Defendants' exhibit was also submitted by Plaintiff as Pl.'s Opp. Ex. G6.

Defendants' exhibits make no reference to searches conducted in the G block bathroom, the F and G corridor, or the clinic room. Instead, they indicate that Plaintiff was moved from his cell, where the initial frisk and search appear to have been conducted, to a hospital visitation room where, after Plaintiff again refused to spread apart his hair for visual inspection, several officers conducted a forcible, videotaped search of Plaintiff's hair. (Schulze Decl. Ex. E at 24, 25, 35.) Defendants' exhibits indicate that C.O. Bonafede videotaped this forcible search using a hand held video camera, C.O. Miller controlled the mechanical restraints (handcuffs) applied to Plaintiff after Defendants assert he became agitated and refused to remain still, C.O. Filipponi conducted the search of Plaintiff's hair using single-use latex gloves, and Lieutenant La Ports and Sergeant Kelly observed. (*Id.* at Ex. E at 22, 24, 25, 35)

Video of the incident corroborates Defendants' account, at least as to the search conducted in the hospital visitation room. Plaintiff, surrounded by a roomful of officers, is first shown calmly refusing to part his hair. (Schulze Decl. Ex. I.) Sergeant Kelly then instructs the searching officer, C.O. Filipponi, to search Plaintiff's hair manually, to which Plaintiff initially consents, saying "Go ahead." (*Id.*) After Plaintiff raises his hands in professed pain and repeatedly requests that the officers do not rip his hair—which he asserts took him twenty years to grow—Plaintiff clarifies that he is refusing the search and that he considers it to constitute a violation of his religious rights. (*Id.*) The officers then handcuff Plaintiff and begin forcibly searching his hair, at which time Plaintiff becomes mildly agitated. (*Id.*) The officers repeatedly assert that they are trying to search Plaintiff's hair as carefully as possible, and C.O. Filipponi, at times with the assistance of other officers, is shown using his gloved fingers and a small flashlight to look and feel between or inside of Plaintiff's dread locks. (*Id.*) After approximately six minutes of searching, Defendants discover one small, clear bag with unknown contents in Plaintiff's hair. (*Id.*) C.O. Filipponi continues the

59

search, discovering two small, black balloons. (*Id.*) After the second balloon is discovered, an unknown officer is heard asking Plaintiff how much more contraband Plaintiff has in his hair, to which Plaintiff appears to answer, "That's it. There's one, and one empty." (*Id.*)

Defendants assert that no hair was cut, torn, or otherwise removed from Plaintiff during this search, although video of the incident is limited to the search in the hospital, and does not show any of the earlier searches that day to which Plaintiff asserts he was initially subjected. (Schulze Decl. Ex. I; *id.* Ex. G ¶ 7 (attesting to the accuracy of the video copy submitted by Defendants).) Defendants also assert, as the video shows, that three items, not two, were recovered from Plaintiff's hair: one clear plastic bag containing a "green clumpy substance," one tied black balloon, which was "later determined to contain a green clumpy substance, and one black opened balloon." (Schulze Decl. Ex. E at 24; *see also id.* at 25, 35 (indicating only that the searching officers recovered a clear plastic bag, not that it contained any substance).) The "green clumpy substance" was sent by C.O. Filipponi for testing at Green Haven's lab that same evening where it was later revealed to consist of 9.2 grams of methamphetamine. (Pl.'s Opp. Ex. G3; *see also* Schulze Decl. Ex. E at 22.)

Plaintiff acknowledges that the officers conducted the February 28, 2008 search on the basis of information suggesting Plaintiff had hidden such contraband in his hair (Pl.'s Aff. ¶ 42),[31] and Defendants assert the search was penologically justified for this reason. (Schulze Decl. Ex. H ¶ 9.) In his opposition memorandum, however, Plaintiff highlights several perceived discrepancies in the officers' account of the February 28, 2008 search, contending that the search was without valid "penological justification." (Pl.'s Opp. 27–28.)

---

[31] On the basis of this purported confidential information, Sergeant Bucolo authorized a search of Plaintiff's cell the same evening, which an incident report indicates recovered a state razor, a wooden fork, a wooden spoon, a metal hot pot, and an altered radio—but no drugs. (Pl.'s Opp. Ex. G7.)

Plaintiff, for instance, highlights a series of certain discrepancies in the justification offered by Defendants for their search of his hair: "confidential reliable information received that [inmate] was in possession of contraband (drugs)," on the basis of which Plaintiff was required to submit to a urinalysis test (*id.* Ex. G3); "confidential information that drugs are in cell," on the basis of which—according to a February 28, 2008 document prepared by Sergeant Bucolo—a search was conducted of Plaintiff's cell (*id.* Ex. G7); and an anonymous letter indicating that Plaintiff and another prisoner were involved in drug activity, as well as Plaintiff's failure to part his hair on his own (Schulze Decl. Ex. F at 52:11–15, 57:9–12). Plaintiff also points to discrepancies between a 5:30 p.m. report from February 28, 2008 in the "F&G Strip Frisk Room" indicating that Plaintiff was initially frisked on the basis of "an unknown object in groin area," (*id.* Ex. G8), and a 7:00 p.m. report from the same day in the "Hosp. IPC" indicating that the basis for additional searching was "inmate is unable to run hands through. Hand scanner continues to ring on inmates [sic] hair" (*id.* Ex. G9.)

On April 1, 2008, Plaintiff wrote a letter to Commissioner Fisher detailing the harassment he faced as a consequence of his hair, alleging he was set up, and asking for a complete investigation into the February 28, 2008 incident, so it could be expunged from his record. (Pl.'s Opp. Ex. Fish #4.) Plaintiff was eventually sentenced to nine months in SHU for possession of the contraband recovered during the February 28, 2008 search. The fairness of the disciplinary proceeding that resulted in this sentence is the subject of Plaintiff's due process claims. *See supra* Part V.

Plaintiff also alleges that his hair was again searched on March 6 and 15, 2008, but has provided no evidence of these incidents beyond his verified Amended Complaint. (Am. Compl. ¶¶ 30–31.) On March 6, 2008, he alleges that non-party C.O. Dryer pulled his dreadlocks and

61

ripped out portions of his hair during a strip search. (*Id.* ¶ 30.) On March 15, 2008, Plaintiff alleges that he was "stripped frisked and searched by C.O. Raetina who then used the hand scanner to scan[] my hair and no metal was detected." (*Id.* ¶ 31.) Plaintiff alleges that Sergeant Scott nonetheless ordered C.O. Raetina to manually search Plaintiff's hair, despite Plaintiff's protestations. (*Id.*) Plaintiff further alleges that Sergeant Scott telephoned Lieutenant Wilson during the search, and informed Plaintiff that Lieutenant Wilson "gave the order" for his hair to be searched. (*Id.*) Plaintiff alleges that the search was observed by C.O. Freeman and one other, unnamed officer, and that the search caused his dreadlocks to be ripped. (*Id.*)

In his affidavit, Plaintiff also describes a search that allegedly occurred on August 15, 2008. (Pl.'s Aff. ¶ 48.) Plaintiff's Amended Complaint, however, does not describe this search, and so the Court declined, in a May 13, 2015 Order (Dkt. 155), to consider these allegations. Plaintiff contends that the March 15, 2008 date in his Amended Complaint was a typographical error, and that he intended to refer instead to an August 15, 2008 search. While it is true that some of the facts regarding the March 15, 2008 search described in his Amended Complaint mirror those that Plaintiff, in his affidavit, attributes to an August 15, 2008 search, there are also important discrepancies in these accounts, which suggest that the error may have been more than merely typographical. Nonetheless, because Defendants had no reason to seek discovery regarding an August 15, 2008 search, allowing Plaintiff to pursue this claim and amend his complaint—for a second time—would, at this late date, be unduly prejudicial.

Although Defendants dispute Plaintiff's account of the February 28, 2008 search, as to the searches conducted in February 2007, and on March 12, 2007, March 6, 2008, and March 15, 2008, Defendants contend only that they were less intrusive than the February 28, 2008 search, as evidenced by the fact that they were not videotaped. (Schulze Decl. Ex. G ¶ 8.) Plaintiff claims

that all five allegedly improper searches violated his religious rights (Am. Compl. 15), and appears to contend that these searches also constituted "excessive force"—at least to the extent his dreadlocks were torn. (*Id.*) Plaintiff appears to have properly exhausted his administrative remedies regarding these allegedly improper searches of his hair. Defendants, at least, do not contend otherwise.

### 2. *Religious Meals*

Plaintiff asserts he was denied two religious meals on religious holidays by Superintendent Ercole. First, Shepherd alleges on or about October 7, 2005 he was denied a religious meal during the Negust day celebration, which "is a sacred day to all Rastafarians," and for which he had fasted the day before. (Am. Compl. ¶ 24; *see* Pl.'s Aff. ¶ 35.)[32] Second, Shepherd alleges he was similarly denied a religious meal during Fasika or Ethiopian Passover, "[o]ne of the most holiest days Rastafarians comm[emor]ate," on May 5, 2008 (Am. Compl. ¶ 32). "Fasika is celebrated with fasting, a special cooked meal to break the fast." (*Id.*) Plaintiff alleges that on both occasions he forwarded a letter to prison officials requesting a religious meal (*Id.* ¶¶ 25, 32; *see also* Pl.'s Opp. Ex. Griev. #6), and has provided an October 1, 2005 letter to a Green Haven chaplain requesting delivery of his "Holy day meal," (Pl.'s Opp. Ex. L). In his grievances, Plaintiff alleges that he "was informed by the clerk for the Rastafarian Church that a request was made for keep-

---

[32] The Court notes that there appears to be a factual inconsistency in Plaintiff's allegations regarding the denial of a religious meal in October 2005. In Plaintiff's Affirmation and Amended Complaint, he alleges that the religious holiday meal he was denied on or about October 7, 2005 was for the "Negust celebration." (Am. Compl. ¶ 24; Pl.'s Aff. ¶ 35.) In his grievances, however, Plaintiff alleges he was denied "his Fasika Meal on October 6, 2005," not his "Negust" day meal. (*See* Pl.'s Opp. Ex. Griev. #5, Griev. #6.)

lock Rastafarian prisoners to receive their meals and the administration cross[ed] out the request."[33] (Pl.'s Opp. Ex. Griev. #5.)

In deposition testimony, Shepherd asserts that Superintendent Ercole, the Superintendent of Green Haven, "runs the facility," and was responsible for the denial of his religious meals because "[w]hen it comes to any type of religious issues, you contact the superintendent." (Schulze Decl. Ex. B 177:9–177:24.) He also alleges that "[t]he superintendent is supposed to be aware" of religious holidays that require religious meals and that the "superintendent is also aware of all who is registered as Rastafarian" and that he was registered as Rastafarian at Green Haven. (Schulze Decl. Ex. B 178:12–178:25.) Defendants have not submitted any evidence regarding the procedure for requesting or receiving religious meals at Green Haven.

Plaintiff also asserts he properly grieved both incidents. Defendants allege Shepherd failed to exhaust the October 7, 2005 incident. (Hale Decl. ¶ 16.) Shepherd, however, has provided documentation of his initial complaints, dated October 7, 2005 and May 7, 2008. (Pl.'s Opp. Ex. Griev. #5, Griev. #6.) Plaintiff also provides a grievance dated October 21, 2005, in which he states that he has not yet received a response to his previously filed grievance. (Pl.'s Opp. Ex. Griev. #5.) Additionally, Plaintiff submits a letter dated August 8, 2008 to Director Bellamy appealing the denial of his religious meal. (Pl.'s Opp. Ex. CORC #4.). In that letter, Plaintiff alleges that he is "being hindered from filing grievances and appeals because the Guards in the Special Housing Unit are tampering with [his] mail not delivering [his] mail to the Grievance departments" and asks "Could you please file the Enclosed Grievances and appeals." (*Id.*)

---

[33] "[K]eeplock units are housing units that consist of cells grouped so as to provide separation from the general population, and may be used to house inmates confined pursuant to the disciplinary procedures described in regulations." N.Y. Correct. Law § 2(23).

**B. Legal Analysis**

As an initial matter, because Plaintiff exclusively seeks damages from the Defendants (Am. Compl. 17), his freedom of expression claims are cognizable under the First Amendment's Free Exercise Clause, pursuant to 42 U.S.C. § 1983, and not the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq. See Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) ("RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities.").

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). These constitutional protections are not limitless, however. Instead, a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274–75. Even then the challenged conduct will pass constitutional muster insofar as "it is reasonably related to legitimate penological interests," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quotation marks omitted), which the prison officials "bear the relatively limited burden of identifying," *Salahuddin*, 467 F.3d at 275.

In determining whether the conduct of prison officials is reasonably related to penological interests, courts look to four factors: "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right." *Id.* at 274. Inmates, moreover, retain the burden of showing that the legitimate penological interests identified by prison officials are "irrational." *Id.* at 275.

### 1. *Alleged Improper Searches of Plaintiff's Hair*

At the outset, the Court finds that a reasonable factfinder could determine that the challenged searches of Plaintiff's hair substantially burdened his sincere religious beliefs. As a Rastafarian, Plaintiff considers his hair sacred, and his professed beliefs do not allow for his hair to be cut, or to be touched by others. (Pl.'s Aff. ¶¶ 1, 37, 38.) Defendants urge the Court to find that Shepherd's beliefs were not sincere at the time of the challenged searches, arguing that "conceal[ing] a large qua[t]ity of illegal drugs within his dreadlocks" was "inconsistent" with Plaintiff's "professed belief in the sanctity of his hair." (Defs.' Mem. 32.) Defendants, however, have not adduced evidence as to the sincerity of Plaintiff's beliefs or the contours of his Rastafarian faith, and the Second Circuit has cautioned courts against making "conclusory judgments about the unimportance of the religious practice to the adherent." *Ford*, 352 F.3d at 593. The Court thus cannot conclude that no reasonable fact finder could find Plaintiff's beliefs to be sincere.

The Court also finds that the Green Haven policy for conducting searches of Plaintiff's hair is reasonably related to legitimate penological objectives. Defendants have presented significant evidence that searching inmates' hair is necessary to identify and seize contraband, ensure the safety of inmates, officers, and visitors, and maintain prison security. (Schulze Decl. Ex. H ¶¶ 8–9.) They have also demonstrated that DOCCS protocols offer Rastafarian inmates the opportunity to avoid searches by prison officials in violation of their religious beliefs. (*See* Schulze Decl. Ex. L.) Rastafarian inmates may first run their fingers through their own hair to demonstrate the absence of contraband, and their hair is only to be searched by officers if they refuse to comply with this procedure or if officers have probable cause to believe that an inmate is hiding contraband on his or her person. (*See* Schulze Decl. Exs. G, H.) This policy allows prison officials to address legitimate security concerns, while permitting Rastafarian inmates to keep their hair as they wish

66

(at least within proscribed limits not relevant here). Although the policy is a permissible one, the Court must nonetheless analyze whether the specific searches described by Plaintiff impermissibly burdened Plaintiff's exercise of his religious beliefs.

The Court finds that prison officials did comply with these procedures during the February 28, 2008 search of Plaintiff's hair. Although Plaintiff argues that Defendants have articulated inconsistent justifications for this search, the Court can find no meaningful discrepancy in the various official accounts of this incident. The record clearly demonstrates that Defendants, despite possessing incriminating information from an anonymous source, nonetheless afforded Plaintiff the opportunity to avoid a forcible search of his hair by allowing him to part his own dreadlocks to demonstrate the absence of contraband. Only when Plaintiff declined to follow this procedure did Defendants search his hair themselves. The video of this search shows dutiful compliance with the DOCCS procedures by the searching officers, and no finder of fact could determine on the record before the Court that Defendants acted without legitimate penological justification. Defendants' motion for summary judgment is thus granted as to this incident.

The Court, however, has before it no evidence to establish that prison officials complied with the DOCCS procedures in the other searches about which Plaintiff complains. Defendants have provided no justification for these searches, asserting only that they were less intrusive than the February 28, 2008 search. (Schulze Decl. Ex. G ¶ 8.) Intrusiveness, however, is not the only consideration when assessing whether the challenged conduct infringed on an inmate's Free Exercise right. At least to the extent that Plaintiff asserts—in sworn statements—that each search substantially burdened his religious beliefs by ripping or tearing his dreadlocks, defendants must show that the search was reasonable related to legitimate penological interests. *O'Lone*, 482 U.S. at 349.

67

Here, the record contains evidence, in the form of Plaintiff's sworn statements, that Plaintiff's hair was ripped during the February 2007 search overseen by Defendant Towkartz, for which there is no evidence of probable cause justifying a strip search or evidence suggesting that Plaintiff was afforded the initial opportunity to demonstrate the absence of contraband. Indeed, Defendants offer no justification at all for the search. So too with the March 12, 2007 search conducted by Defendants Swan, Castine, Sample, and Alexander; the March 6, 2008 search conducted by non-party Dryer and ordered by Defendant La Ports; and the March 15, 2008 search conducted by Defendants Scott, Raetina, and Freeman and ordered by Defendant Wilson. Although this evidence may well exist, it has not been presented to the Court. Accordingly, in each case, on the current record, a reasonable factfinder could determine both that the exercise of Plaintiff's religious beliefs was substantially burdened, and that the particular manner in which the search was conducted was not reasonably related to legitimate penological objectives.

The Defendants involved in these allegedly non-compliant searches are not entitled to qualified immunity at this time. "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir.2007)). Here, Defendants contend that they are entitled to qualified immunity because their actions did not violate clearly established law. (Defs.' Mem. 33.) In a case involving this very plaintiff, however, the Second Circuit stated that "Circuit precedent holds that a policy requiring haircuts of all male inmates upon incarceration violates the free exercise rights of Rastafarians," and that "the extension of [this precedent] to corrections officers pulling out dreadlocks is straight-forward." *Shepherd v. Sanchez*, 27 F. App'x 31, 33 (2d

68

Cir. 2001). As Defendants themselves note, moreover, DOCCS procedures—procedures followed during the February 28, 2008 search—also prohibit manual searches of an inmate's hair where there is no probable cause or where the inmate is not first afforded the opportunity to demonstrate the absence of contraband himself. Defendants' failure to offer any penological justification for, or other evidence regarding, these searches prohibits summary judgment in their favor, because it was clearly established that ripping a Rastafarian's dreadlocks, without penological justification, infringes on an inmate's Free Exercise right. Defendants' motion for summary judgment is thus denied as to the February 2007, March 12, 2007, March 6, 2008, and March 15, 2008 searches, with which Plaintiff alleges Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman and Wilson were personally involved.[34]

Defendants' motion for summary judgment is granted, however, as to Plaintiff's claims of harassment by Defendant Hann. Even taking as true Defendant Hann's purported threat to cut Plaintiff's hair, communicated to Plaintiff by her subordinate officers, this threat was never realized and Plaintiff's religious exercise was thus never actually burdened.

Defendants' motion for summary judgment is also granted as to Plaintiff's claim in his tenth cause of action that DOCCS Commissioner Fisher, Superintendent Ercole, or Deputy

---

[34] Defendants are granted summary judgment on Plaintiff's claims that Defendants Raetina, Filipponi, Sample, Swan, Castine, and non-party Dryer "knowingly and intentionally use[d] excessive force by ripping/tearing [his] dread locks" during these searches, and that Defendants Trembath, Freeman, Scott, Kelly, Alexander, Miller, Bonafede, Towkartz, and La Ports, "did nothing to stop their subordinates from violating [his] rights." (Am. Compl. 15.) "[T]he Eighth Amendment's prohibition against cruel and unusual punishment does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009) (quoting *Hudson*, 503 U.S. at 10). Plaintiff has not alleged that he suffered any injury as a result of the ripping/tearing of his dreadlocks that was "objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8. "[T]he absence of any significant injury to [Plaintiff] does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic, *Wright*, 554 F.3d at 270, but here Plaintiff has not alleged that officers ripped or tore his dreadlocks with such motivation.

Koskowski, "[failed] to ensure their subordinates were adequately and properly trained in knowing and understanding [his] religious beliefs . . . and adhering to said beliefs." (Am. Compl. 15.) Although the Court finds that Plaintiff has shown facts sufficient to withstand summary judgment as to all but the February 28, 2008 search of his hair, the record does not establish that Defendants Fisher, Ercole, and Koskowski were directly involved in these incidents, that they acted with gross negligence, or that they promulgated a policy or custom pursuant to which these incidents arose. Indeed, the record demonstrates that DOCCS officials promulgated a frisk policy carefully designed to safeguard inmates' religious rights (Schulze Decl. Ex. L), and that Green Haven officers—judging from their dutiful compliance with this policy on February 28, 2008—were both aware of the policy and knew how to follow it. Under *McKenna*, moreover, even if Defendants Fisher and Ercole did participate in the adjudication of Plaintiff's grievances regarding these incidents, because Plaintiff has not alleged that either was directly responsible for the supervision and training of the frisking officers, he cannot show that they failed to remedy a wrong of which they were aware. *See McKenna*, 386 F.3d at 437-38; *Colon*, 58 F.3d at 873. In his role as Deputy of Security, Defendant Koskowski may have been directly responsible for such supervision and training, but Plaintiff has not alleged that he was involved in any way in the adjudication of Plaintiff's grievances. Plaintiff's letter to Superintendent Ercole (Pl.'s Opp. Ex. G-H Supt.), also fails to provide a basis for liability under existing Second Circuit precedent. *See Sealey*, 116 F.3d at 51.[35]

### 2. Alleged Denial of Religious Meals

The constitutional protection afforded prisoners under the Free Exercise Clause of the First Amendment "extends to a prisoner's right to a diet consistent with his or her religious scruples."

---

[35] For a more extended discussion of the standard for supervisory liability see *infra* Section I.B.4.

70

*Williams v. King*, No. 11-CV-1863, 2014 WL 3925230, at \*5 (S.D.N.Y. 2014), *order clarified*, No. 11-CV-1863, 2014 WL 4670866 (S.D.N.Y. 2014) (quotation marks omitted).  Even if an inmate's free exercise rights are abridged, however, the conduct is constitutional as long as it "was reasonably related to some legitimate penological interests." *Ford v. McGinnis*, 352 F.3d 582, 594 (2d. Cir. 2003).

In *Ford v. McGinnis*, the Second Circuit assumed without deciding that a prisoner must demonstrate that the burden on his religious exercise is substantial, and held that the denial of even one religious meal that prevented the inmate from participating in a religious holiday important to that inmate's practice of his religion constituted a substantial burden.  352 F.3d at 594; *see also Williams v. Does*, 639 Fed. App'x 55, 57 (2d Cir. 2016) (summary order) (holding district court's determination that the burden on inmate's free exercise rights was "*de minimis* because only a few of his meals were delivered prematurely" during the month of Ramadan when inmate was fasting was "inconsistent with this Court's case law, which cautions against the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent." (quotation marks omitted)).

Here, Plaintiff asserts he was denied a religious meal on two Rastafarian holidays, which he alleges were important to his religious practice.  (Pl.'s Aff. ¶ 35; Am. Compl. ¶ 32.)  Therefore, Plaintiff has adequately alleged there was a substantial burden on his religious rights.  Moreover, Defendants have not presented any evidence that Shepherd was denied these religious meals for any penological purpose.

Defendants argue that Plaintiff has sued the wrong person—that he cannot establish Defendants Commissioner Fisher and Superintendent Ercole "were personally involved in the alleged events." (Defs.' Mem. 33.)  But viewing the facts in the light most favorable to the non-

71

moving party, Shepherd has alleged the personal involvement of Superintendent Ercole.  Shepherd

asserts that the Superintendent is the person "you contact" "[w]hen it comes to any type of religious

issues."  More specifically, he contends that it is the superintendent's role at Green Haven to "be

aware" of religious holidays that require religious meals and be "aware of all who [are] registered

as Rastafarian," including Shepherd.  (Schulze Decl. Ex. B 178:12–178:25; *see* Pl.'s Opp. at 30

("The superintendent of the facility has the day to day operation of the facility and is responsible

for ensuring that plaintiff receives his religious meals.").)  Defendants have not introduced any

evidence to refute these sworn statements by Shepherd.  Thus, on the current record, the Court

must conclude that Shepherd has adequately alleged the personal involvement of Superintendent

Ercole.  The Court agrees however, that Shepherd has not sufficiently alleged the personal

involvement of Commissioner Fisher, and grants Defendant Fisher's motion for summary

judgment.

Because Court is bound by Second Circuit case law that makes clear that a denial of a

single religious meal can violate an inmate's constitutional rights if it occurs on a significant

religious holiday, and because there are at least genuine issues of material facts about whether

Ercole was personally responsible for this deprivation, the Court reconsiders its prior grant of

summary judgment to Defendants on this claim pursuant to Federal Rule of Civil Procedure 54(b).

*See Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277,

288 (2d Cir. 2011).  Defendants' motion for summary judgment is thus denied as to Plaintiff's

religious meal claims against Defendant Ercole.

**V.  Plaintiff's Procedural Due Process Claims**

In his fourteenth cause of action, Plaintiff alleges that Captain Burnett and DOCCS

Commissioner Fisher "knowingly violated [his] due process rights, unlawfully and illegally

72

confining [him] to segregation, as defendant Fisher affirmed Burnett's guilty determination."
(Am. Compl. 16.)

## A. The Factual Record

Following the February 28, 2008 search of Shepherd's hair, he was issued a ticket charging
him with various offenses, including possession of contraband—specifically, methamphetamine.
(Defs.' R. 56.1 Statement ¶ 66.) Plaintiff received advanced written notice of these charges, and
was provided an assistant, who helped him gather evidence in advance of a hearing. (*Id.* ¶¶ 67–
68.) Following the hearing, Plaintiff was issued a written statement of the disposition, including
a summary of the evidence on which the hearing officer, Burnett, relied and the grounds for the
disciplinary action taken. (*Id.* ¶ 71.) Plaintiff was convicted of the possession offense, the most
serious charge brought against him, and was sentenced to nine months in the Special Housing Unit
("SHU"). (*Id.* ¶ 72.)

Plaintiff raises several concerns with the procedural fairness of the hearing. First, he
alleges that Burnett refused to provide him several pieces of documentary evidence: the
anonymous note on which the February 28, 2008 search for contraband in Plaintiff's hair was
purportedly premised; a color photo of the alleged contraband (as the charging ticket identified the
contraband in part by its color); a color photo of the drug test indicating the contraband substance
was methamphetamine;[36] and lab reports from an independent test of the substance supposedly
conducted by the State police. (Am. Compl. ¶ 33; *see also* Pl.'s Aff. ¶¶ 51–52.)[37]

---

[36] A summary of this test, which states that the tested substance was methamphetamine, is attached
to Plaintiff's opposition memorandum as exhibit G10.

[37] A summary of the State police investigation is attached to Plaintiff's Opposition Memorandum
as exhibit H.

Second, Plaintiff contends that Burnett violated his due process rights by admitting into evidence scientific tests of the contraband, without first laying a proper foundation as to the procedures employed in these tests or establishing that the testing officers in fact complied with these procedures; photographs of the contraband, without properly establishing a chain of custody as to who took the photographs and when they were taken; and the State police tests, without first establishing who turned the contraband over to the State police for testing and when they did so. (Am. Compl. ¶ 34.)

Finally, Shepherd contends that Burnett did not act as a "fair and impartial" hearing officer. (Am. Compl. ¶ 35.) Specifically, Plaintiff alleges that Burnett himself gave testimony as to the testing of the contraband, despite not having personally conducted the tests; improperly explained a discrepancy as to when the contraband was turned over to the Green Haven testing officer, despite Plaintiff directing his question to that officer, and not Burnett; improperly asked a pharmacist-witness questions "as to whether methamphetamine could be spread or sprinkled/soaked on any other substance" without any "basis" for this line of questioning; and failed to disclose his personal involvement in the State police investigation of the contraband substance, in part by lying as to whether it had been turned over to the police at all. (Am. Compl. ¶ 35.) Plaintiff asserts that the initial ticket he received following the February 28, 2008 search did not mention that the contraband was turned over to the State police; that prison officials denied that the substance was turned over to the police during Plaintiff's disciplinary hearing; and that only several years later did he discover the substance had been turned over to the State police and that Burnett had been personally involved in the State police investigation. (Pl.'s Aff. ¶¶ 49–50; *see also id.* ¶ 54–55 ("Any person conducting a disciplinary hearing cannot be part of any investigation concerning the subject matters of the misbehavior report.").) In his opposition

74

papers, Plaintiff also contends that his hearing assistant failed to provide him "with documentation needed in order to prepare and present an[] adequate defense," including the State police reports and independent testing results. (Pl.'s Opp. 32.)

Plaintiff has also produced a single page of a State police report summarizing their investigation of the February 28, 2008 incident, which indicates that Burnett met with the investigating police officer on March 7, 2008, and provided him with a copy of the "Unusual Incident Report." (Pl.'s Opp. Ex. H.) This same report indicates that the investigating officer also attempted to interview Plaintiff on March 7, 2008, but that Plaintiff refused to come out of his cell in SHU to speak with the officer. (*Id.*) The report also suggests that the contraband was turned over to the State police, although the limited version of the document provided to the Court does not indicate whether the police then conducted additional testing. (*Id.*)

As a consequence of these alleged procedural errors, Plaintiff contends that he was "unlawfully confined . . . in segregation for nine months with loss of good time, phone commis[s]ary and recreation." (Am. Compl. ¶ 35.) Plaintiff also continues to assert that "officials planted the items they found in [his] hair, there was never reason for them to search [his] hair, the officials set [him] up, and Lt. Towkart[z] said as much to another prisoner that was housed in SHU." (Pl.'s Aff. ¶ 59; *see also* Pl.'s Opp. Ex. Aff. of Odam.)

### B. Legal Analysis

Prisoners may avail themselves of the "protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Prison disciplinary proceedings, however, "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* Indeed, "[d]iscipline by prison officials in response to a wide range of misconduct falls within

the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995).

Inmates are "nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as . . . special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). Although the "duration of SHU confinement . . . is not the only relevant factor" in determining whether special confinement imposes an atypical hardship, absent "abnormal or unusual SHU conditions, periods of confinement of less than 101 days" are unlikely to implicate a protected liberty interest. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). Here, the Court assumes, without deciding, that Plaintiff's sentence of nine months in SHU—or nearly 300 days—implicates a liberty interest.

Plaintiff was thus entitled to "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). Specifically, prison officials must "give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing," and the notice must include "at least some specific facts underlying the accusation." *Sira*, 380 F.3d at 70 (quotation marks omitted). Furthermore, the record must show at least "some evidence" to support a finding of guilt, *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)—a requirement the Second Circuit has interpreted to mean "reliable evidence of the inmate's guilt." *Luna*, 356 F.3d at 488 (quotation marks omitted).

Importantly, however, inmates have no "right to counsel or to confrontation at prison disciplinary hearings." *Sira*, 380 F.3d at 69. Nor is the "right to know evidence supporting prison disciplinary rulings . . . absolute." *Id.* at 74. Thus, "when the disclosure of evidence

76

presents [] risks [of violence or intimidation], hearing officers may properly decline to inform an inmate of the adverse evidence"—assuming they provide a "reasonable justification" for doing so when challenged. *Id.* at 75. In addition, "in prison administrative proceedings prison officials are generally not required to adhere to rules of evidence or other standards employed by courts of law in an attempt to assure accurate fact-finding." *Ortiz*, 380 F.3d at 660. And the violation by prison officials of state regulations or DOCCS directives "does not in itself give rise to a due process claim." *O'Diah v. Artus*, 887 F. Supp. 2d 497, 501 (W.D.N.Y. 2012); *see Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights.").

Moreover, a court may impose a remedy for an alleged due process violation in a prison disciplinary procedure only if the constitutional error was not harmless, at least in the absence of a pattern of violations. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation." (citations omitted)); *Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing.").

Consistent with the curtailed procedural rights afforded inmates, Defendants' motion for summary judgment is granted as to Plaintiff's Due Process claims. Plaintiff does not contest that he received advanced written notification of the charges against him and a written statement of the

disposition against him, including a statement of the evidence on which Burnett, the hearing officer, relied. Furthermore, because prison officials need not adhere to the rules of evidence in conducting inmate disciplinary proceedings, Plaintiff's various evidentiary concerns—including as to how Burnett conducted the disciplinary hearing, as well as the unavailability of color photographs of the contraband substance and the test indicating it was methamphetamine—do not rise to the level of a constitutional violation. *See Ortiz*, 380 F.3d at 660.

Similarly, although Second Circuit precedent provides for inmates "to receive employee assistance when that inmate is charged with an offense warranting SHU confinement," *Sloane v. Borawski*, 64 F. Supp. 3d 473, 485 (W.D.N.Y. 2014) (citing *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993)), the alleged deficiency of Plaintiff's assistant here is not of a constitutional dimension. Plaintiff concedes that he received an assistant, and the record demonstrates that this assistant gathered substantially all of the evidence requested by Plaintiff, with Plaintiff contesting only whether the assistant gathered *every* document requested. (Schulze Decl. Ex. E at 13; Ex. F at 6:1–22, 71:1–78:4.) Thus, while "[a]n assistant who does nothing to assist the segregated inmate in the preparation of a defense fails to accord such inmate his limited constitutional due process right of assistance," *Jermosen v. Coughlin*, No. 89-CV-1140E(M), 1993 WL 328482, at *4 (W.D.N.Y. 1993), *aff'd*, 29 F.3d 620 (2d Cir. 1994), Plaintiff's assistant did far more than nothing, and Plaintiff was not denied his limited right of assistance.

As to the withheld documentary evidence, Plaintiff has not shown he was prejudiced by the fact that Defendants did not provide him with the anonymous note or the State police test of the contraband. Defendant Kelly, who received the anonymous note, testified at the disciplinary hearing, and Plaintiff was provided ample opportunity to question him. (Schulze Decl. Ex. F at 57:23–58:20.) Therefore, even assuming Defendant did not offer a justification for not entering

the anonymous note into evidence, Plaintiff has shown no prejudice. It is true that Plaintiff's exhibits appear to demonstrate that the State police performed an independent test of the contraband (Pl.'s Opp. Ex. H); however, Plaintiff has not claimed that the withheld evidence was exculpatory, nor does Burnett's disposition appear to have relied on this evidence. (Schulze Decl. Ex. E at 5.) Thus, even assuming arguendo that Defendants should have turned over this evidence to Plaintiff, the record, which includes the highly inculpatory videotape presented at the disciplinary hearing (Schulze Decl. Ex. I), a transcript of Plaintiff's disciplinary hearing (*id.* Ex. F), and the written disposition against him (*id.* Ex. E at 5), makes clear that there was a sufficiently substantial—and reliable—evidentiary basis on which to find Plaintiff guilty. *See Luna*, 356 F.3d at 488; *Clark*, 590 F. Supp. 2d at 429.

As to Plaintiff's argument that Burnett was biased, and of a "predetermined mindset," (Pl.'s Mem. 32), the sufficiency of the evidence "is irrelevant." *Edwards v. Balisok*, 520 U.S. 641, 648 (1997). In prison disciplinary proceedings "it is permissible for the impartiality of [hearing officers] to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Claims of bias can nonetheless survive summary judgment where a plaintiff shows he had "no chance to prevail at the hearing," *id.*, but Plaintiff has not provided such evidence here. Taken in its entirety, with all inferences drawn in favor of Plaintiff, the record does not permit a finding that Burnett prejudged Plaintiff's guilt, or that Plaintiff had no chance of prevailing at the hearing. The record shows that Burnett safeguarded Plaintiff's procedural rights: for instance, by repeatedly allowing Plaintiff extra time to obtain and review additional evidence and finding in Plaintiff's favor as to two of the charges brought against him. (*See generally* Schulze Decl. Ex. F, Ex. E at 5.)

Because the Court finds that Defendants Fisher and Burnett did not violate Plaintiff's procedural rights, his assertion that he was falsely accused of the conduct underlying his disciplinary hearing also cannot survive summary judgment. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) ("[A] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. . . . [A] prison inmate[], has the right not to be deprived of a protected liberty interest without due process of law.").

Defendants' motion for summary judgment is thus granted in full as to Plaintiff's due process claims.

## V.    Plaintiff's Legal Mail Claim

In his fifteenth cause of action, Plaintiff alleges that Lieutenant Hann "knowingly, willingly and intentionally [had] [his] confidential legal letter confiscated and/or lost/destroyed [his] legal letter, interfering with access to [his] attorney, violating attorney, client privile[ge]." (Am. Compl. 16.)[38]

### A.    The Factual Record

On or about November 27, 2007, a DOCCS officer confiscated a personal letter from Plaintiff, as well as a piece of legal mail concerning a then-pending case to which Plaintiff was a party. (Defs.' R. 56.1 Statement ¶ 73.) Plaintiff was told by the confiscating officer that Lieutenant Hann ordered the confiscation. (*Id.* ¶ 74.) Despite the confiscation of his legal mail, however, Plaintiff was able to address the demands of his ongoing case with his attorney. (*Id.* ¶ 75.) Plaintiff

---

[38] As part of this cause of action, Plaintiff also alleges that Defendant Hann "discriminated against [him] due to [his] religion," (Am. Compl. 16), but this claim appears to relate to Defendant Hann's purported harassment of Plaintiff due to the manner in which he keeps his hair, and not to Plaintiff's legal mail claim. The Court has considered Defendant Hann's purported discrimination against Plaintiff on the basis of his religion in *infra* Part IV.

nonetheless insisted that his legal mail be returned, and grieved this incident accordingly. Plaintiff alleges that this legal mail was never returned to him or received by his attorney. (Am. Compl. ¶ 18.)[39]

### B. Legal Analysis

Because Plaintiff's claim relates to only one instance of interference with his mail, on November 27, 2007, any allegations that officials tampered with his mail in violation of his constitutional right to the free flow of incoming and outgoing mail are unavailing. *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation.").

Plaintiff's arguments are also unavailing as to any claim that Defendant Hann's interference with his mail violated his right of access to the courts. Prisoners do have a right of access to the courts, a right alternately grounded in the "Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses." *Christopher v. Harbury*, 536 U.S. 403, 414–415 & n.12 (2002) (citations omitted); *see also Morello v. James*, 810 F.2d 344, 346 (2d Cir. 1987). Tampering with prison mail implicates this right where "the tampering unjustifiably chilled the prisoners' right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351.

To succeed in such a claim, however, Plaintiff must show that "the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Id.* (quotation

---

[39] In a letter to DOCCS Commissioner Fisher dated April 21, 2008, Plaintiff alleges that he was "not receiving my mail, my family and lawyer are not receiving my mail. My fiancée sent legal documents transcripts over night mail and verified that the documents arrived at Green Haven. I have not received anything." (Pl.'s Opp. Ex. Fish. #1.) Plaintiff, however, made no such allegations in his Amended Complaint, nor has he otherwise directly asserted that prison officials interfered with his mail for an extended period of time beyond the November 27, 2007 confiscation.

marks omitted). In particular, Plaintiff needed to demonstrate actual injury and specify which legal matter Defendants' alleged tampering hindered him from pursuing. *See Christopher*, 536 U.S. at 415; *see also Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008) (explaining that a showing of "actual injury" requires a plaintiff to "demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim"). Because Plaintiff concedes that the alleged confiscation of his legal mail did not prevent him from addressing the requirements of his then-pending case, his claim fails. He has not even attempted to allege actual injury, nor has he provided any information as to the particular legal matter in question. Defendants' motion for summary judgment as to Plaintiff's legal mail claim is thus granted.

## CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is denied in part and granted in part. Defendants' motion for summary judgment is granted as to all of Plaintiff's claims except as to his: (1) deliberate indifference claim against Defendant Bentivegna regarding Plaintiff's requests for pain medication on or about March 3, 2008; (2) Eighth Amendment claim against Defendants Tweed, Sarles, and Ferrick based on Shepherd's allegations of sexual assault; (3) First Amendment retaliation claim against Defendant Sarles regarding a frisk search on January 23, 2007; (4) First Amendment claim against Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman, and Wilson regarding searches in February 2007 and on March 12, 2007, March 6, 2008, March 15, 2008, and August 15, 2008;[40] and (5) First Amendment claim against Defendant Ercole for the denial of two religious meals on significant Rastafarian holidays. Accordingly, the second, third, fourth, fifth, eighth, tenth,

---

[40] Summary judgment is granted, however, as to Plaintiff's claim regarding the February 28, 2008 search.

twelfth, thirteenth, fourteenth, fifteenth, and sixteenth causes of action are dismissed.  This case will proceed against Defendants Tweed, Sarles, Ferrick, Ercole, La Ports, Towkartz, Alexander, Bentivegna, Wilson, Scott, Freeman, Raetina, Swan, Castine, and Sample on the remaining causes of action.

Because the Defendants withdrew their motion for sanctions seeking to dismiss Plaintiff's complaint with prejudice, the Clerk of the Court is respectfully requested to close the motion pending at Docket Number 175.

A conference is scheduled in this matter for March 2, 2017 at 3:00 p.m.

SO ORDERED.

Dated:    February 16, 2017
          New York, New York

Ronnie Abrams
United States District Judge